In the Matter of the INVOLUNTARY TERMINATION OF PARENTAL RIGHTS OF: S.P.H. and H.P.H., Children, and James Hancock, Father, Appellant–Respondent,

v.

Clay County Division of Family and Children, Appellee–Petitioner.

No. 11A05–0401–JV–23.

Court of Appeals of Indiana.

April 27, 2004.

Fritzy D. Modesitt, Brazil, IN, Attorney for Appellant.

Margaret A. Berry, Brazil, IN, Attorney for Appellee.

**OPINION**

RILEY, Judge.

Appellant–Respondent, James Hancock (Hancock), appeals the trial court's invol-untary termination of his parent-child rela-tionship with his two children, S.P.H. and H.P.H.

We affirm.

### ISSUES

Hancock raises two issues on appeal, which we restate as follows:

1. Whether the trial court's order of termination should be reversed because Appellee–Petitioner, Clay County Division of Family and Children (CCDFC), failed to comply with statutory requirements in the Child in Need of Services (CHINS) pro-ceeding, thereby violating Hancock's due process rights in the involuntary termi-nation proceeding; and

2. Whether the evidence is sufficient to sustain the trial court's determination to terminate the parent-child relationship be-tween Hancock and his children.

### FACTS AND PROCEDURAL HISTORY

Melissa McCrary (McCrary) is the natu-ral mother of D.C., born on August 20, 1997; S.P.H., born on June 25, 2000; and H.P.H., born on February 13, 2002. Han-cock is the natural father of S.P.H. and H.P.H.[1] On July 17, 2002, the Clay County Sheriff's Department (Sheriff's Depart-ment) conducted a search of the home shared by McCrary, Hancock, and the three minor children. During the search, the Sheriff's Department found drugs, methamphetamines, and precursors for making it. Upon finding the three minor children at the home, the Sheriff's Depart-ment contacted the CCDFC. When the CCDFC arrived at the residence, Hancock was already arrested, whereas McCrary and the children were still inside while the

---

**1.** We note that since Hancock is only the natural parent of S.P.H. and H.P.H., D.C. is not part of this appeal.

Sheriff's Department was completing its investigation. Prior to her arrest, McCrary helped the CCDFC gather the children's clothes so they could be placed in foster care.

The home was in total disarray and filthy. The floors were weak and unstable; the carpet moved when walking over it. The rooms were filthy and "the kitchen was piled up." (Transcript p. 13). The bedroom was cluttered, with possessions strewn over the beds. The children told the caseworker there were loose animals inside, including a rabbit "hopping all over the house." (Tr. p. 14).

On July 24, 2002, the CCDFC filed a CHINS Petition. On September 3, 2002, the trial court conducted a dispositional hearing on the CCDFC's Petition. Subsequently, on September 6, 2002, pursuant to the fact-finding hearing, the children were adjudicated CHINS. On December 19, 2002, the trial court held a formal six-month review of the dispositional decree with a permanency hearing conducted on July 17, 2003.

On May 16, 2003, the CCDFC filed a Petition to Terminate the Parental Rights of both McCrary and Hancock. On September 30, 2003, the trial court conducted a fact-finding hearing on the termination petition. Following this hearing, on October 21, 2003, the trial court issued its Judgment of Involuntary Termination of the Parent Child Relationship ordering the termination of Hancock's parent-child relationship with S.P.H. and H.P.H.

Throughout the entire CHINS and termination proceedings, Hancock was incarcerated, initially in the Clay County Jail and subsequently in the Carlisle Correctional Facility. On January 21, 2003, Hancock pled guilty to dealing a schedule II controlled substance, a Class B felony; possession of precursors, a Class D felony; possession of marijuana, a Class D felony;

and neglect of a dependent, a Class D felony. Hancock received a cumulative sentence of eight years with two years probation and home detention following his release.

Hancock now appeals the involuntary termination of his parent-child relationship with S.P.H. and H.P.H. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Procedural Due Process Violations*

■ Hancock asserts that the CCDFC failed to comply with the statutory requirements regarding the CHINS proceeding, which resulted in violations of his due process rights during the involuntary termination proceeding. Specifically, Hancock asserts the following deficiencies: (1) he failed to receive notices for the various hearings conducted during the CHINS proceedings; (2) the CCDFC failed to negotiate with him prior to filing the case plans; and (3) he was never transported to the CHINS hearings.

At the outset, we review CCDFC's argument that Hancock raises these arguments for the first time on appeal. Despite the constitutional nature of his claim, it is well established that we may consider a party's constitutional claim waived when it is raised for the first time on appeal. *McBride v. Monroe County Office of Family and Children*, 798 N.E.2d 185, 194 (Ind.Ct.App.2003). Even though Hancock contends statutory violations during the CHINS proceedings, he nevertheless fails to provide us with the appropriate record of the hearing. *See* Ind. Appellate Rule 46(A)(8)(a). Furthermore, although the trial court only appointed counsel to represent Hancock after the CHINS proceedings, our review of the termination hearing reveals that Hancock's counsel never objected *in limine* to the CHINS proceed-

ings because of failure to comply with statutory provisions. As a result, we agree with the CCDFC that these issues are waived on appeal. *Id.* Waiver notwithstanding, we will address Hancock's contentions on their merits.

■ When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of the due process clause. *J.T. v. Marion County Office of Family and Children,* 740 N.E.2d 1261, 1264 (Ind.Ct.App.2000), *trans. denied.* Our legislature has enacted an interlocking statutory scheme governing CHINS proceedings and the involuntary termination of parental rights proceedings. *A.P. v. Porter County Office of Family and Children,* 734 N.E.2d 1107, 1112 (Ind.Ct.App.2000), *trans. denied.* This statutory scheme is designed to protect the rights of parents in raising their children while allowing the State to effect its legitimate interest in protecting children from harm. *Id.* The CHINS and involuntary termination statutes are not independent of each other. *Id.* Indiana Code section 31–35–2–2 clearly states that although termination proceedings are different from CHINS proceedings, an involuntary proceeding is "governed by the procedures prescribed by" the CHINS statutes contained in Indiana Code Article 31–34. *Id.*

In support of his contentions, Hancock relies on *A.P. v. Porter County Office of Family and Children,* 734 N.E.2d 1107, 1112 (Ind.Ct.App.2000), *trans. denied.* In *A.P.,* this court considered the relationship between CHINS and termination proceedings as follows:

> [P]rocedural irregularities in a CHINS proceedings may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights. It would be incongruous to hold that a county,

with the assistance of a juvenile court, may commence CHINS proceedings for a child and remove a child from his or her home, yet disregard various portions of the CHINS and termination statutes on several occasions and still terminate parental rights following the passage of time after a CHINS dispositional decree and child's removal from the home.

*Id.* at 1112–13. In *A.P.,* we considered "a record replete with procedural irregularities throughout the CHINS and termination proceedings that [were] plain, numerous, and substantial." *Id.* at 1118. In sum, we analyzed seven substantial irregularities that, when taken together, required reversal of the trial court's termination decision as a violation of due process. *Id.* at 1117; *see also McBride,* 798 N.E.2d at 195. However, of those seven irregularities, we noted that not any of the deficiencies, standing alone, would have resulted in a due process violation. *Id.* In this regard, we find *A.P.* distinguishable from the instant case. Here, we find not a single procedural deficiency.

First, Hancock argues that he failed to receive notice on the CHINS proceedings. However, our review of the record clearly discloses that the trial court served Hancock with the CHINS petition and notices of the review hearings. (Appellee's App. pp. 1, 3, 7, and 9). Additionally, Hancock admits in his brief that "service [of the CHINS petition] was made on [him] via U.S. mail." (Appellant's Br. p. 6).

■ Next, Hancock alleges that the CCDFC failed to negotiate with him prior to filing the case plans. In particular, Hancock references the absence of his signature on the case plans. Indiana Code chapter 31–34–15 governs case plans in CHINS proceedings. Specifically, Ind. Code § 31–34–15–1 provides that, "a case plan is required for each child in need of

services who is under the supervision of the county," while I.C. § 31–34–15–2 provides that "[t]he county office of family and children, after negotiating with the child's parent, guardian, or custodian, shall complete a child's case plan ..." Initially, we are mindful that the statute is not all-inclusive. The statutory language merely requires the county officer of family and children to negotiate with the parent, or the guardian, or the child's custodian. In this regard, the record discloses that the CCDFC negotiated the case plan with McCrary, the non-incarcerated parent of S.P.H. and H.P.H., prior to submitting the plan to the trial court for approval. Furthermore, we note that the case plan's purpose is to serve notice of parental conduct that could lead to termination of the parent-child relationship. See A.P., 734 N.E.2d at 1114. The record reveals that Hancock was provided with copies of both case plans and thus was put on notice. Additionally, the statute lacks the requirement that the case plan has to be signed by the parent. Instead, the CCDFC is mandated to negotiate and submit a case plan within a specified time period. Therefore, the absence of Hancock's signature does not amount to a procedural irregularity.

■■■ Lastly, Hancock contends that his due process rights were violated because the trial court failed to secure his presence during the CHINS hearings. We have previously held that an incarcerated parent has no absolute right to be physically present at the proceedings. See J.T., 740 N.E.2d at 1264. Rather, the decision whether to permit an incarcerated person to attend such a hearing rests within the sound discretion of the trial court. Id. at 1265. Here, the trial court did not even have to reach this decision. The record indicates that, unlike the termination hearing, Hancock never filed a motion to transport for the CHINS hearings. As such, we find Hancock's argument to be without merit.

In light of this evidence, we find no procedural irregularities with regard to the CHINS proceedings. Consequently, we hold that Hancock received the process that was due to him. See id.

## II. Sufficiency of the Evidence

■■■ Next, Hancock asserts that the evidence was insufficient to support the trial court's determination to terminate his parent-child relationship with S.P.H. and H.P.H. In reviewing termination proceedings on appeal, this court will not reweigh the evidence nor assess the credibility of the witnesses. In re T.F., 743 N.E.2d 766, 773 (Ind.Ct.App.2001), trans. denied. We only consider the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. Id. Where, as here, the trial court enters findings of fact and conclusions of law in its termination of parental rights, our standard of review is two-tiered. Doe v. Daviess County Div. of Children & Family Services, 669 N.E.2d 192, 194 (Ind.Ct.App. 1996), trans. denied. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the conclusions of law. Id.

■■ In deference to the trial court's unique position to assess the evidence, we set aside the trial court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. T.F., 743 N.E.2d at 773. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. In re D.G., 702 N.E.2d 777, 780 (Ind.Ct.App.1998). A judgment is clearly erroneous only if the conclusions of law drawn by the trial court are not supported by its findings of fact or the conclusions of law do not support the judgment.

*Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind.1996).

■■■ The involuntary termination of parental rights is the most extreme measure that a court can impose and is only designated as a last resort when all other reasonable efforts have failed. *D.G.,* 702 N.E.2d at 780. This policy is in recognition of the Fourteenth Amendment to the United States Constitution which provides parents with the right to establish a home and raise children. *Matter of A.N.J.,* 690 N.E.2d 716, 720 (Ind.Ct.App.1997). However, these protected parental rights are not absolute and must be subordinated to the children's interest to maintain the parent-child relationship. *Id.*

■■ The purpose of terminating parental rights is not to punish parents but to protect their children. *Id.* Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents. *Id.* To effect the involuntary termination of a parent-child relationship, the CCDFC must present clear and convincing evidence establishing that:

(A) one (1) of the following exists:

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(ii) a court has entered a finding under I.C. § 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) after July 1, 1999 the child has been removed from the parent and had been under the supervision of a county officer of family and children for at least fifteen (15) months of the more recent twenty-two (22) months;

(B) there is reasonable probability that:

(i) the condition that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

I.C. § 31–35–2–4(b)(2).

In the instant case, Hancock first asserts that the CCDFC failed to prove that the conditions resulting in the removal of the children would not be remedied. With regard to this, the trial court entered the following relevant findings of fact and conclusions of law pursuant to a fact-finding hearing on October 21, 2003:

4. The following facts were established by clear and convincing evidence by the [CCDFC]:

\* \* \*

b. That the [CCOFC] was unable to provide services to [Hancock] due to his incarceration with the Indiana Department of Corrections for [d]ealing in a[s]chedule II[c]ontrolled [s]ubstance, a B[f]elony; [p]ossession of [p]recursors, a D[f]elony; [p]ossession of [m]arijuana, a D[f]elony; and [n]eglect of a[d]ependent, a D[f]elony. He was sentenced to an eight (8) year prison term with an additional two (2) years of probation upon his release. The events that were the basis of these criminal charges occurred on the property which was the home of [Hancock] and the [c]hildren.

* * *

5. That pursuant to the establishment of the facts stated above, the [c]ourt would make the following [c]onclusions of [l]aw:

* * *

b. There is a reasonable certainty that the conditions which resulted in the children's removal and placement outside the home will not be remedied; and the continuation of the parent-child relationship poses a threat the physical, mental and emotional well-being of the children.

(Appellant's App. pp. 1 B–C).

■■■ Hancock now argues that the trial court's findings are clearly erroneous because his incarceration was not a sufficient basis for terminating his parental rights. Additionally, Hancock maintains that he provided a satisfactory arrangement with the children's aunt to provide professional care and guidance for his children, and as a result, termination was not necessary.

■■■ To determine whether conditions are likely to be remedied, the trial court must examine Hancock's fitness to care for the children as of the time of the termination hearing and take into account any evidence of changed conditions. A.N.J., 690 N.E.2d at 720. At the same time, the trial court must evaluate Hancock's patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. Id.

Here, the children were removed from Hancock's house on July 17, 2002, after Hancock was arrested for drugs and drug precursors. Following a plea agreement, he was ultimately sentenced to a term of eight years of imprisonment, to be followed by two years of probation and home detention. Hancock now points to evidence in the record to support his position that he never placed any drug items in dangerous proximity of the children. In this regard, Hancock's testimony is enlightening:

There was no meth lab ever found on my property. I was growing marijuana and I had precursors there that could be made into meth, yes. But there was never no meth ever found in the house where the kids were living, no dope, no nothin'.

(Tr. p. 95). In light of this testimony, Hancock attempts to persuade us that he has forfeited his drug addiction. However, it is the trial court's prerogative to conclude that Hancock might be drug free while in prison, but that based on his pattern of conduct it will not last once he is released and the probability will be high that the situation will once more become as it was before he was incarcerated. See Odom v. Allen County Dept. of Public Welfare, 582 N.E.2d 393, 396 (Ind.Ct.App. 1991). Therefore, based on Hancock's blatant denial that there were drugs in the house, we are inclined to agree with the trial court that the possibility of recurring drug abuse is substantial. See id.

Moreover, with regard to placement of the children with Hancock's sister, testimonial evidence indicates that, even though placement of the children with Hancock's relatives was initially investigated and encouraged, it was eventually ruled out by the CCDFC. Lori Dickison, the case manager, testified as follows:

From what was reported to us by the State Police at the time of the investigations, there was drug use history of [Hancock's parents] which that's been discussed. The main issues with [Hancock's sister] would be issues with [McCrary] still being in town; [McCrary] stating herself that she felt like the children would be used against her as a pawn; her still being in the

area, [Hancock's sister] not being able to control; [McCrary's] drug use, which at this point this was discussed she was still using [.] There was no evidence on [McCrary's] part that she was going to stop using. The personality changes that people can go through under meth use and the unpredictability that she could show up on [Hancock's sister] doorstep and things that would be out of [Hancock's sister] control in being able to protect the children, such as [McCrary] knowing right exactly where they were. (Tr. pp. 39–40).

Based on the evidence before us, we conclude that the trial court made the appropriate finding to illustrate Hancock's substance abuse. Despite Hancock's contention that his substance abuse is under control, there is ample evidence to suggest that his conduct poses a substantial probability of future neglect or deprivation of the children. Additionally, placement of the children with Hancock's sister would expose the children again to the environment they need to escape. As the CCDFC determined, there is no guarantee that Hancock's sister would be able to provide the children with a safe and stable home. Therefore, we find that the trial court properly concluded that the conditions that resulted in the children's removal would not be remedied.

■ Hancock also argues that the CCDFC failed to establish that continuation of his parent-child relationship with S.P.H. and H.P.H. poses a threat to the children's well-being. First, we note that where, as here, the trial court specifically finds that there is a reasonable probability that the conditions which resulted in the removal of the child would not be remedied, and there is sufficient evidence in the record supporting the trial court's conclusion, it is not necessary for the CCDFC to prove or for the trial court to find that the continuation of the parent-child relationship poses a threat to the child. *A.N.J.,* 690 N.E.2d at 721 n. 2.

■ Nevertheless, in the instant case, the trial court also made findings of fact from which it concluded that there was a reasonable probability that continuation of Hancock's parent-child relationship with S.P.H. and H.P.H. poses a threat to their well-being. In this respect, the trial court found as follows:

4. The following facts were established by clear and convincing evidence by the [CCDFC]:

\* \* \*

c. The children have all made significant progress and improvement in behavior since being placed in foster care. The children have been in foster care for over fifteen (15) months. The father of [S.H.] and [H.H.] will not be released from incarceration for another two (2) or three (3) years. The [CCOFC] had investigated placement with family members but, in conjunction with opinions of the children's counselors, has not found any such placements suitable.

\* \* \*

5. That pursuant to the establishment of the facts stated above, the [c]ourt would make the following [c]onclusions of [l]aw:

\* \* \*

b. there is a reasonable certainty that the conditions which resulted in the children's removal and placement outside the home will not be remedied; and the continuation of the parent-child relationship poses a threat

the physical, mental and emotional well-being of the children.

(Appellant's App. pp. 1 B–C).

In the instant case, Lori Dickison testified that the children needed a sense of permanency and a stable place to live. She further stated that the children had done well in their foster home. She expressed concern about Hancock's lengthy incarceration, and his failure to seek services. She concluded that she believed it to be in the best interests of the children to terminate Hancock's parental rights.

Additionally, even assuming that Hancock will be released in two or three years, he will have missed a significant part of S.P.H.'s and H.P.H.'s developmental years. During this time, Hancock will not be able to provide financially for the children. Upon his eventual release from prison, there will be no guarantee that he will be able to care for his children or that he would ever get custody of them. Consequently, we find the needs of the children to be too substantial to force them to wait while determining if Hancock would be able to be a parent for them.

Taken together, the evidence is sufficient to prove by clear and convincing evidence that termination of Hancock's parental rights is in the best interests of the children. Accordingly, we find that the evidence supports the trial court's findings of fact, and that the findings, in turn, support the trial court's determination. *See Doe,* 669 N.E.2d at 194. In addition, based on our analysis set forth above, we hold that the evidence is sufficient to support the trial court's termination of Hancock's parent-child relationship with S.P.H. and H.P.H. *See T.F.,* 743 N.E.2d at 773.

## CONCLUSION

Based on the foregoing, we conclude that Hancock's due process rights were not violated and the evidence is sufficient to support the trial court's termination of his parent-child relationship.

Affirmed.

KIRSCH, C.J., and NAJAM, J., concur.