911 N.E.2d 69 (2009)
In the Matter of the Involuntary Termination of the Parent-Child Relationship of J.H., A.G., Z.G., and P.M., Minor Children, and the Father of P.M.
Z.M., Appellant-Respondent,
v.
Marion County Department of Child Services, Appellee-Petitioner, and
Child Advocates, Inc., Appellee-Guardian-Ad-Litem.
No. 49A02-0812-JV-1147.
Court of Appeals of Indiana.
August 11, 2009.
*70 Jill M. Acklin, Westfield, IN, Attorney for Appellant.
Grace M. Baumgartner, Bluffton, IN, Attorney for Appellee.

*71 OPINION
RILEY, Judge.

STATEMENT OF THE CASE
Appellant-Respondent, Z.M. (Father), appeals the trial court's Order terminating his parental rights to his minor child, P.M.
We affirm.

ISSUE
Father raises one issue on appeal, which we restate as follows: Whether the trial court erred in terminating Father's parental rights to P.M. when the Marion County Department of Child Services (DCS) had entered into an agreement with Father granting him the right to exercise visitation rights with his minor son.

FACTS AND PROCEDURAL HISTORY
Father is the parent of P.M., born on October 12, 2004. On July 20, 2006, the Marion County Department of Child Services (DCS) filed a Petition Alleging Children in Need of Services (CHINS) as a result of P.M.'s mother[1] being arrested for neglect of a dependant and Father being arrested for battery against P.M.'s half-sister. The petition stated that Father had physically abused P.M.'s older half-sister after mother had asked Father to discipline the child and mother had failed to intervene to stop the abuse. That same day, during the trial court's initial hearing on the CHINS petition, Father admitted to the allegations contained in the petition, and P.M. was found to be a CHINS. On September 7, 2006, the trial court issued a dispositional order making P.M. a ward of the DCS. P.M. was subsequently placed in foster care.
Pursuant to the Participation Order, entered by the trial court on October 7, 2006, Father was required to participate and complete reunification services, which included, among others, maintain legal and stable income and housing, complete counseling programs, complete a parenting assessment and complete parenting classes, and abstain from any non-prescription drug use. Father participated in and completed a parenting assessment while he was incarcerated and participated in home-based services after his incarceration ended. However, he failed to maintain employment, stable housing, did not attend parenting classes nor did he regularly exercise supervised visitation or complete his required drug and alcohol screens. During his participation in services, Father refused to recognize any problems with using corporal punishment which resulted in welts and bruising. He also acknowledged that he had physically disciplined P.M. when he was as young as nine months old.
On February 6, 2008, the DCS filed a Petition for Involuntary Termination of the Parent-Child Relationship. On February 13, 2008, Father signed an "Advisement for Parents Regarding Proceedings to Involuntarily Terminate the Parent-Child Relationship," (Advisement) acknowledging that he had read and understood his rights pertaining to the proceeding to terminate his parental rights to P.M. (Appellant's App. p. 29). Specifically, this Advisement provided, in pertinent part, that
7. If the [c]ourt terminates the parent-child relationship then all rights, privileges, immunities, duties and obligations (including any rights to custody, control, visitation, or support pertaining to that relationship) are permanently terminated, *72 and the parents' consent to the child's adoption by persons unknown to them is not required.
(Appellant's App. p. 29).
Thereafter, in March of 2008, Father indicated that he no longer wished to participate in services because he did not seek reunification with P.M. He decided to stop participating in home-based services through DCS because P.M.'s mother was "going to be having the thirty day in-house visitations with [P.M.]" and Father "did not mind going over there with [P.M.'s mother]." (Transcript p. 1074). As a result of his decision, on March 27, 2008,[2] during a case conference meeting, Father, DCS, the Guardian-Ad-Litem, and two home-based counselors executed an agreement detailing his supervised visitation with P.M., which specifies, in pertinent part:
I, [Father], agree to the following terms regarding my participation in my son, [P.M.'s] CHINS case.
1) I will have a supervised visit with my son [P.M.] for one hour each week on a regular basis at a set date/time.
 If I visit at [P.M.'s] mother's home, I understand it must be supervised... and it must be arranged beforehand, I cannot just show up.
 I will call at least one hour in advance if I must cancel a visit.
2) I will not need to participate in a home-based counseling program any longer, however; I will not be successfully discharged or have a positive recommendation for reunification with my son.
3) I will participate in random urine drug screens through Mosaic Recovery.
...
4) I will keep in regular contact with my Family Case Manager, ... and/or Adult & Child, home-based counselors to communicate about visits, drug screens, court, and the progress of my son's case.
(Petitioner's Exh. 5).
After signing the agreement, Father received no more referrals for services. The status hearings during this time period reflect this understanding. For example, on May 14, 2007, the trial court noted in its order that "[Father] has stepped back and has always indicated that he wanted mother to have custody of [P.M.]. [Father] does not want custody of [P.M.].... Court will not order DCS to re-refer services for [Father] at this time." (Petitioner's Exh. pp. 172, 174). Also, consistent with the terms of the agreement, Father was not allowed to visit with P.M. in April, May, and June of 2008 because he refused to participate in drug screens.
On November 12, 2008, the trial court terminated Father's parental rights to P.M. In its Order, the trial court ordered that "all rights, powers, privileges, immunities, duties and obligations, including any rights to custody, control, visitation, or support, pertaining to the relationship are permanently terminated." (Appellant's App. p. 24).
Father now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION
Father does not contend that the DCS failed to support the required statutory elements for termination by clear and convincing evidence; rather, Father's sole *73 contention is that the trial court's Order terminating his parental rights is inconsistent with the March 27, 2008 agreement which provided that Father would have supervised visitation with his son as long as he participated in drug screens.
In reviewing termination proceedings on appeal, this court will not reweigh the evidence nor assess the credibility of the witnesses. In Re Involuntary Termination of Parental Rights of S.P.H., 806 N.E.2d 874, 879 (Ind.Ct.App.2004). We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. Id. Where, as here, the trial court enters findings of fact and conclusions of law in its termination of parental rights, our standard of review is two-tiered. Id. First, we determine whether the evidence supports the findings, and second, whether the findings support the conclusions of law. Id.
In deference to the trial court's unique position to assess the evidence, we set aside the trial court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. Id. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. Id. A judgment is clearly erroneous only if the conclusions of law drawn by the trial court are not supported by its findings of fact or the conclusions of law do not support the judgment. Id.
It is axiomatic that the traditional right of parents "to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." Matter of M.B., 666 N.E.2d 73, 76 (Ind.Ct.App. 1996), trans. denied. However, the trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination of the parent-child relationship. In re K.S., 750 N.E.2d 832, 837 (Ind.Ct.App. 2001). Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. Id. at 836.
In support of his argument that we should reverse the trial court's Order because of the inconsistency with the March 27, 2008 agreement, Father focuses our attention on In re E.E.S., 874 N.E.2d 376 (Ind.Ct.App.2007), reh'g denied, trans. denied. In In re E.E.S., the Office of Family and Children (OFC) had entered into an agreement with mother to support the family bond until mother was released from prison and had an opportunity to carry out case plan requirements in exchange for mother admitting to the allegations in the CHINS petition. Id. at 377. Prior to mother's release from incarceration and notwithstanding this agreement, the OFC filed a petition to terminate mother's parental rights which the trial court granted. Id. at 378. Mother appealed and asserted that the OFC had violated the agreement by proceeding with terminating her parental rights prior to her release from prison. We reversed. Id. at 382.
By its own terms, In re E.E.S. characterizes itself as an anomaly in the established case law. We clearly noted that although "this is a cause in which we would typically affirm the termination of parental rights[,] we must reverse because the [OFC] failed to uphold its end of the agreement it made with [mother]." Id. at 381. Based upon the language used in the agreement, we found that the OFC committed to support the family bond until mother was released from prison and had an opportunity to engage in services. Id. In this light, we referred to the terms of the case plan, many of which were not available until mother was released from *74 prison. Id. Even though we reversed the trial court's order terminating mother's rights, we strongly cautioned the OFC, stating
We disapprove of this type of agreement because it restricts the OFC from acting pursuant to the termination statutes or in the best interests of the children. Nevertheless, neither can we allow an OFC to ignore such an agreement when the parent's consideration for the agreement was, in essence, waiver of the right to due process at the CHINS proceeding.
Id. at 382.
Based on these unique circumstances, we find In re E.E.S. to be inapposite to the matter at hand. Here, Father did not receive visitation rights with his son in exchange for his admission to the CHINS allegations. Rather, the agreement was executed after the DCS had filed its petition to involuntarily terminate his parental rights and Father had signed an Advisement, acknowledging that he had read and understood his rights regarding the proceeding to terminate his parental rights to P.M. In addition, unlike In re E.E.S. where mother had not yet participated in services and still wished to be reunited with her children, the record here reflects that prior to entering into the agreement, Father refused to further participate in services because he did not seek reunification. Furthermore, the terms of the agreement itself merely clarify how and under which conditions he could exercise his visitation time.
In the case at bar, we are faced with an agreement that, at first glance, appears to be inconsistent with a termination of parental rights procedure. On the one hand, the agreement between Father and DCS grants Father visitation rights with his minor son conditioned on the satisfaction of specific requirements; whereas, a termination of the parent-child relationship permanently terminates "all rights, powers, privileges, immunities, duties, and obligations, including any rights to custody, control, parenting time, or support, pertaining to the relationship." Ind.Code § 31-35-6-4(a)(1). Because the DCS had already filed its petition to involuntarily terminate Father's parental rights, it seems that Father attempted to avoid a permanent cessation of these rights by entering into an agreement granting him visitation rights. Thus, the agreement attempts to sidestep the clear and unambiguous provision of Indiana Code section 31-35-6-4(a)(1).
It is true that, in general, the law declares that a contract made in contravention of a statute is void. Jaehnen v. Booker, 806 N.E.2d 31, 36 (Ind.Ct.App., 2004), trans. denied. However, we have also previously recognized the principle that a contract will not automatically be held void merely because it violates a statute. Id. In such cases, we have held that a court may consider other factors such as the subject matter of the contract, the strength of the public policy underlying the statute, and the likelihood that the court's decision in voiding the contract will actually further that public policy. Id.
"American public policy holds that children are likely best raised by their parents[,]" and that termination of parental rights is a tool of "last resort" to be used only after parents have had "numerous opportunities to rectify their situations" but have failed to do so "over a prolonged period." Baker v. Marion County Office of Family & Children, 810 N.E.2d 1035, 1041 (Ind.2004). Notwithstanding this policy, the court also recognized that "it is in the child's best interest and overall well being to limit the potential for years of litigation and instability. `It is undisputed that children require secure, *75 stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty.'" Id. (quoting Lehman v. Lycoming County Children's Servs. Agency, 458 U.S. 502, 511, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982)).
Although phrased in terms of a natural parent's ability to arbitrarily withdraw his or her voluntary consent to terminate parental rights and adoption, we find the policy rationale of Matter of Snyder, 418 N.E.2d 1171 (Ind.Ct.App.1981), to be applicable to the present case. In Snyder, we stated
If a natural parent were allowed to arbitrarily withdraw his or her voluntary relinquishment of parental rights, then adoption of the child would be discouraged. Few prospective parents would want to start the lengthy process of adoption when there is a possibility that the natural parent would withdraw his or her relinquishment of parental rights, thus ending the adoption proceedings. A ruling allowing the arbitrary withdrawal of a voluntary relinquishment of parental rights would subject every adoptive parent and child to the possibility of a most cruel and emotional turmoil, and because of this fact it would make adoptive parents the ready prey of possible unscrupulous parents. Therefore, a parent who executes a voluntary relinquishment of parental rights is bound by the consequences of such action, unless the relinquishment was procured by fraud, undue influence, duress, or other consent-vitiating factors.
Id. at 1180 (internal citations and quotations omitted).
Similarly, we believe that allowing parents to avoid the consequences of the termination of their parental rights by executing an agreement providing for visitation, or any other parental right, in an attempt to circumvent Indiana Code section 31-35-6-4(a)(1), would impermissibly tie the hands of the trial court and the DCS, while at the same time discourage future adoption of the child whose parents' rights have been terminated. Nevertheless, we also acknowledge that the agreement entered into between Father and DCS was valid until the trial court issued its Order terminating Father's parental rights to P.M. However, we conclude that the agreement became void at the moment the trial court entered its Order terminating Father's parental rights. This holding furthers the strong public policy underlying Indiana's termination statutes in protecting our children's emotional and  in some instances  physical well-being and in avoiding protracted instability and uncertainty in the lives of children whose parents have failed to rectify their situation or refuse reunification outright.

CONCLUSION
Based on the foregoing, we conclude that the trial court did not err by terminating Father's parental rights.
Affirmed.
BAKER, C.J., and FRIEDLANDER, J., concur.
NOTES
[1] Mother is not part of this appeal as she consented to P.M.'s adoption during the trial terminating her parental rights.
[2] The agreement is not dated at the top or dated by each signatory. However, next to the signature of the DCS's family case manager, the date "3/27/08" is written. Trial testimony revealed that a case conference took place on March 27, 2008, during which the agreement was signed.