**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 09 2012, 9:12 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT
Y.B. (Mother):

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
V.B. (Minor Child) and Y.B. (Mother), )
              )
   Appellant,         )
              )
     vs.          )   No. 49A02-1111-JT-1133
              )
THE INDIANA DEPARTMENT OF CHILD )
SERVICES and CHILD ADVOCATES, INC., )
              )
   Appellee and Co-Appellee.   )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gary Chavers, Judge Pro-Tempore and
The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1107-JT-26401

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Senior Judge**

STATEMENT OF THE CASE

Y.B. ("Mother") appeals the termination of her parental rights as to her minor child, V.B.[1]

We affirm.

ISSUE

Whether there was clear and convincing evidence to support the termination of Mother's parental rights.

FACTS

V.B., Mother's tenth child, was born on September 29, 2009. At the time of V.B.'s birth, three of Mother's children were involved in a pending CHINS case and Mother's rights to her six other children had been terminated in October 1999. All nine of the older children were removed from Mother's care due to her abuse of crack cocaine, and the three involved in the CHINS case at the time of V.B.'s birth were additionally removed for domestic violence in the home involving Father.[2]

---

[1] The trial court also involuntarily terminated the parental rights of R.B. ("Father"). Father appealed separately, and in an unpublished decision, this court affirmed the trial court's judgment terminating Father's parental rights. He will only be discussed as necessarily related to the presentation of the facts herein. DCS's brief jointly addresses Father's arguments from his appeal and Mother's arguments from this appeal.

[2] The nine older children are not part of this appeal but will be discussed as necessary in the presentation of the facts.

On October 2, 2009, when V.B. was only three days old and still at Wishard Hospital, the Marion County Department of Child Services ("DCS") filed a petition alleging V.B. to be a child in need of services ("CHINS") due to Mother's substance abuse issues, Mother's failure to complete services in her pending CHINS case, and her history of relationships that involved domestic violence. Subsequently, V.B. was placed in the temporary custody of DCS.

On November 3, 2009, the trial court held a pretrial hearing on the CHINS petition. Mother appeared in person and with counsel. In an amended CHINS petition, DCS and Mother stipulated that (1) V.B. was a CHINS; (2) Mother had an extensive history with DCS, including a pending CHINS and termination case concerning three of her older children[3] and a prior termination of her parental rights as to six of her other children due to substance abuse issues; (3) at the time of removal, she was residing at the Julian Center due to domestic violence in her home; and (4) she lacked stable housing at the time.

The trial court found V.B. to be a CHINS and entered a parental participation decree ordering Mother to, among other things, "[s]ecure and maintain a legal and stable source of income"; [o]btain and maintain suitable housing"; "[p]articipate in and successfully complete a homebased counseling program with the child and successfully complete any recommendation of the counselor"; "[c]omplete age-appropriate parenting classes"; "[s]ubmit to random drug testing"; "establish paternity as to [V.B.]"; participate

---

[3] On March 21, 2011, the trial court involuntarily terminated Mother's parental rights as to the three children involved in those proceedings. Mother appealed the trial court's decision therein, and this court affirmed the decision of the trial court in an unpublished opinion.

in supervised visitation with V.B.; participate in and successfully complete drug treatment if any screens are positive; and continue with mental health treatment. (DCS's Ex. 6).

In February 2010, Mother tested positive for alcohol and marijuana. The trial court ordered Mother's visits to be suspended if she tested positive again.

In May 2010, Mother's visits with V.B. were suspended due to a positive drug screen, and she was placed back in an intensive out-patient program "IOP" due to this positive screen. Thereafter, Mother started attending Narcotics Anonymous and Alcoholics Anonymous meetings. Mother also began domestic violence classes even though she believed she did not need to participate in those classes. Additionally, Mother participated in the Goodwill Workforce program and signed up to take classes to receive her GED. At that time, Mother and Father were living together.

In the summer of 2010, Mother had at least seven positive drug screens. Mother told DCS that some of her drug screens were positive in the summer of 2010 because her neighbor had put cocaine in seafood salads during their feud. Later, she changed her story regarding the positive drug screens and alleged that cocaine was an ingredient in her diet pills; but, she refused to release the diet pills for testing.

In September 2010, the court ordered Mother to complete a domestic violence assessment because the police were called to Mother and Father's home six times in June 2010 due to domestic violence. One month later, Mother got a protective order against Father. The court noted that Mother had weekly visits with V.B. Over several months,

4

Mother had seven positive drug screens, but due to three consecutive negative screens, her visits with V.B. were not suspended.

On December 7, 2010, the trial court held a permanency hearing where Mother appeared with counsel. DCS alleged the following concerning Mother: she had completed the IOP; her last positive drug screen was in July 2010; she did not submit to drug screening in October or the week before the hearing; Mother was participating in domestic violence treatment; she was unemployed; she had contact with Father even though there was a no contact order in place; her home-based counseling program was going to close out unsuccessfully; and, DCS was requesting the trial court to suspend Mother's supervised visitation with V.B. After considering DCS's recommendation, the trial court ordered that the plan for permanency be changed from reunification to termination and adoption.

Mother subsequently tested positive for cocaine twice in June 2011; thereafter, DCS ceased all services, except for visits, based on the positive drug screens. Mother failed to complete all her drug screens, home-based counseling, and/or home-based therapy.

DCS filed a petition for involuntary termination of Mother's parental rights on July 11, 2011. The trial court held a termination hearing on October 19, 2011. During the hearing, Julie Lisek, the lead staffer for Chemical Dependency and family counseling, testified that she began working with Mother in the trauma IOP in January 2010. Although Mother successfully completed the program, Lisek testified that Mother had difficulty and struggled to refrain from using alcohol and cocaine. Lisek stated that

5

"[Mother] would test negative several times and then test positive . . . however in the early part of her treatment she tested pretty regularly positive for [ ] especially alcohol, particularly alcohol." (Tr. 214). Lisek diagnosed Mother with both alcohol and cocaine dependence. In the prognosis section of Mother's discharge report, Lisek classified Mother's chances for successful recovery as "guarded". (Tr. 217). Lisek testified that "guarded" indicates that a client might not be completely ready to stop abusing drugs or alcohol. (Tr. 217).

John Buckingham, a family case manager with DCS, was assigned V.B.'s case on April 13, 2010. Buckingham testified that at the end of 2010 he contacted Mother regarding her positive drug screens and Mother stated, "[Y]eah I may have smoked up with my sister." (Tr. 60). In the summer of 2011, Buckingham contacted Mother again about her positive drug screens and Mother admitted, "[Y]eah I'm using, I'm testing positive I might as well use." (Tr. 60). Buckingham further testified that it was important for Mother to be sober while parenting V.B. He expressed his concerns about Mother's ability to make good decisions and said, "[S]ubstance abuse can lead to decline in making good decisions." (Tr. 61-62).

Dishawn Adams, Mother's home-based therapist, testified that he worked with Mother from February to July 2011. Adams testified that he did not recommend that Mother receive unsupervised visitation or temporary trial in-home visitation with V.B. due to her continued positive drug screens. He further testified that Mother's abuse of drugs could lead her to "neglect [her] children or forget what their needs are." (Tr. 230).

6

T. Carolyn Doss, Mother's home-based therapist from January to July 2010, testified that she had always been concerned about the relationship between Mother and Father. She testified that Mother and Father had "many episodes of domestic abuse" and that "they were both pretty physical." (Tr. 112). She further testified that the police were called to Mother and Father's house six times between June 13 and June 19, 2010 due to domestic violence. Furthermore, Doss testified that Mother had admitted to the abusive relationship. She told Doss that she had gotten into an argument and fight with Father. Also, Mother admitted to Doss that she and Father would strike each other.

Doss further testified that she wrote a discharge report on July 27, 2010, wherein she recommended against V.B. returning to Mother in fear of V.B.'s safety in Mother's home. She came to this conclusion because of domestic violence in the home and Mother's temper. Doss revealed that "when [Mother] gets angry she really gets angry and she says lots of things. She calls people names, even her kids." (Tr. 118).

Nancy Dean-Robbins, a case manager at Families First, testified that she received Mother's case in September of 2010. She testified that Mother's treatment plan was "to stay sober, find employment and stable housing." (Tr. 124). Dean-Robbins further testified that Mother completed her IOP while she was working with her; however, initially Mother did not find stable employment or housing. Dean-Robbins testified that Mother stayed with different friends; her deceased brother's house; and, finally she ended up living at Father's house. Additionally, Mother told Dean-Robbins that she had gotten a protective order against Father because she was in fear of him.

Lisa Krieg, a home-based case manager with Families First, took over Mother's case two weeks before the termination hearing. Krieg testified that since she had been managing Mother's case, she had scheduled two supervised visits between Mother and V.B. and Mother canceled both. Krieg testified that Mother canceled one visit because she had started a new job and the other because she had broken her ankle.

Mark Bass, V.B.'s Guardian ad Litem, recommended adoption as V.B.'s permanency plan. Specifically, he testified that he recommended that V.B.'s foster parents adopt her because V.B. had bonded with her foster parents in the two years that she had resided there; the foster parents were willing to adopt her; her parents had not completed all of the court-ordered services; and, removal from the foster home would harm V.B. Bass further testified that although he had set up a plan for Mother to receive unsupervised visitation with V.B., it never occurred because Mother continued to use drugs and did not follow the protective order in regards to Father.

Mother testified that when V.B. was born she was undergoing CHINS proceedings with three of her older children and acknowledged that her parental rights to those three children were eventually terminated. Mother admitted to having been addicted to cocaine but asserted that she had been clean for approximately seven or eight months. She also admitted that three of her children had tested positive for crack cocaine at birth.

Concerning Mother's relationship with Father, she testified that they "had a good relationship and then it got rocky." (Tr. 19). Mother testified that Father never hit her but that he had shoved her. Mother further testified that the three older children had been removed from her care due to domestic violence. Although Mother sought out a

8

domestic violence advocate on her own, she claimed that she only got a protective order against Father "[be]cause DCS told [her] to get one." (Tr. 20). She asserted that she did not need the protective order and that she had gotten it in order to get her children back. During her testimony, Mother admitted that she had last seen Father in July or August 2011. Due to this contact, they were arrested because they both had protective orders against each other.

On October 24, 2011, the trial court entered its order terminating Mother's parental rights. The trial court found, in pertinent part, as follows:

7.  A substance abuse assessment, resulting in a referral for outpatient treatment, was made. [Mother's] history of cocaine use start[ed] in 1994. [Mother] also reported to a home based therapist that she commenced drinking alcohol and using marijuana at the age of fourteen.

. . . .

10.  [Mother] used cocaine after completion of her treatment program, and tested positive for cocaine on June 15th and June 20th, 2011.

. . . .

12.  [Mother] denied at trial that she has tested positive for cocaine during [V.B.'s] CHINS case.

. . . .

29.  There is a reasonable probability that the conditions that resulted in [V.B.'s] removal and continued placement outside the home will not be remedied by her mother. [Mother] has relapsed since completing substance abuse treatment. She has had continued contact with [Father] after completing domestic violence classes, and does not believe she needs the protective order which will expire this month. Completion of those services failed to remedy conditions of a long history of substance abuse, or domestic violence. She has not been able to successfully complete home based services in the time [V.B.'s] case has lingered, and she has undergone services in past CHINS cases. [Mother] never reached the point

9

of parental fitness to justify unsupervised visits with [V.B.], let alone the fitness required to care for her full time. [Mother's] pattern and history of substance abuse and [DCS] involvement, along with her propensity to place blame on others, leads the court to conclude that there is a reasonable probability that [Mother's] behavior will not change in the future.

. . . .

40. Continuation of the parent-child relationship poses a threat to the well-being of [V.B.] Without successfully addressing substance abuse and domestic violence issues, the parents cannot prov[ide] a safe environment with appropriate parenting and free of neglect. Continuation of the parent-child relationship at this point only poses a barrier to obtaining permanency for [V.B.] through adoption.

(App. 12-14).

## DECISION

Mother contends that DCS failed to prove by clear and convincing evidence that her parental rights should be terminated. Specifically, she argues that DCS did not prove that there is a reasonable probability that the conditions that resulted in V.B.'s removal or the reasons for placement outside Mother's home would not be remedied or that the continuation of the parent-child relationship between Mother and V.B. poses a threat to V.B.'s well being.

The Fourteenth Amendment of the United States Constitution protects a parent's right to establish a home and raise her child. *In re I.A.*, 903 N.E.2d 146, 152 (Ind. Ct. App. 2009). These rights afforded to parents may be terminated when a parent is unable or unwilling to meet her parental responsibilities. *Id.* The rationale behind the termination of parental rights is not to punish parents but to protect the children. *Id.* "The law makes [it] abundantly clear that termination of a parent's relationship with a

child is an extreme measure to be used only as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *In re H.T.*, 901 N.E.2d 1118, 1122 (Ind. Ct. App. 2009).

Although parental rights are constitutionally protected, they "are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination." *McBride v. Monroe County Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Therefore, a trial court should not wait until a child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

When reviewing the termination of parental rights on appeal, we will neither reweigh the evidence nor assess the credibility of witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We will consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom. *Id.* Since the trial court has entered findings of facts and conclusions of law, we apply a two-tiered standard of review. *Id.* First, we must determine whether the evidence supports the findings. *Id.* Second, we must establish whether the findings support the conclusions of law. *Id.* In deferring to the trial court, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings of fact do not support the conclusions or the conclusions of law do not support the judgment. *Id.*

When DCS seeks to terminate parental rights, it must plead and prove in relevant part:

11

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2).  DCS must prove these allegations by clear and convincing evidence.  *I.A.*, 903 N.E.2d at 153.

Since subsection (b)(2)(B) is written in the disjunctive, DCS is only required to prove one of the three elements by clear and convincing evidence.  *Id.*  While the trial court found the first two prongs of subsection (B) to be true, only one was needed to terminate Mother's parental rights.  *Id.*  Thus, we will only address whether DCS has established that there is a reasonable probability that the conditions resulting in removal will not be remedied.

Mother asserts that DCS failed to prove that Mother did not successfully remedy the issues that resulted in V.B.'s removal.  To determine whether the conditions are likely to be remedied, "the trial court must assess a parent's ability to care for her children as of the date of the termination proceeding and take into account any evidence of changed conditions."  *In re K.S.*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001).  "However, the trial court should also take into account the parent's habitual patterns of conduct as a means of determining the probability of future detrimental behavior."  *Id.*  In doing so, trial courts

12

may properly consider "evidence of a parent's criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *I.A.*, 903 N.E.2d at 154.

In addition, in determining whether conditions will be remedied, the trial court may also take into account the services offered to a parent by DCS and the parent's response to those services. *Id.* Furthermore, "DCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change." *Id.*

Here, DCS removed V.B. from the hospital when she was only three days old and, thereafter, initiated CHINS proceedings. At that time, Mother had a CHINS case pending concerning three of her other children because she was abusing crack cocaine and domestic violence was occurring in her home. Furthermore, her parental rights as to six of her other children had previously been terminated due to substance abuse issues. Mother was ordered to complete certain services in this case, but failed to successfully complete her home-based services. Although Mother completed an IOP, she did not stop abusing drugs and has blamed others for her positive drug screens. Consequently, DCS ceased all services in July 2011 due to Mother's positive drug screens. Moreover, Mother continued to have contact with Father even after completing domestic violence classes.

The evidence shows that Mother admitted to being addicted to crack cocaine. Mother told a home-based therapist that she began drinking alcohol and using marijuana at age fourteen. Mother has participated in substance abuse treatment programs many

13

times since 1988, but she has relapsed after each program. She testified that three of her children tested positive for cocaine at birth. In the summer of 2011, Mother admitted to DCS that she was still using cocaine after completion of her treatment program. However, during the termination hearing Mother denied that she had tested positive for cocaine during V.B.'s CHINS case.

Service providers testified regarding their concerns surrounding Mother's history of drug use. Specifically, Lisek, a case manager at Families First, diagnosed Mother with alcohol and cocaine dependence and opined that Mother may not be entirely ready to stop abusing drugs and alcohol. One of Mother's home-based therapists testified that he did not recommend unsupervised visitation or temporary trial in-home visitation between Mother and V.B due to Mother's history of drug use.

Additionally, there is evidence that Mother and Father were involved in domestic violence during the pendency of the CHINS proceedings in this case. The police visited Mother and Father's home six times between June 13 and June 19, 2010 due to domestic violence. Although at trial Mother denied that she needed a protective order, she had told a case worker earlier that she was in fear of Father. Mother also admitted to one of her home-based therapists that she and Father would hit each other, even though she told other service providers there had been no violence or abuse between them. Even after completing domestic violence classes, Mother has had continued contact with Father. Despite having mutual protective orders, Mother and Father were discovered together in July 2011 and both were arrested. DCS was concerned that Mother would continue to have a relationship with Father due to his financial support of her.

Furthermore, Mother does not have adequate employment. Mother styles hair for a living, but she only makes a minimal income from it. In addition, although it appears that Mother had an appropriate home at the time of the hearing, she still must rely on others to assist her financially with maintaining the home.

We find that DCS established its allegations against Mother by clear and convincing evidence. Such evidence supports the trial court's findings that the conditions that resulted in the removal of V.B. will not be remedied; therefore, we cannot say the trial court's judgment is clearly erroneous.

Affirmed.

FRIEDLANDER, J., and BROWN, J., concur.

15