## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 30 2018, 9:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Renee M. Ortega
Lake County Juvenile Public Defender's Office
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of: J.C. (Minor Child),

and

J.M.C. (Father),
*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

July 30, 2018

Court of Appeals Case No. 18A-JT-536

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Jr., Judge

Trial Court Cause No. 45D06-1610-JT-240

**Bradford, Judge.**

# Case Summary

[1] J.M.C. ("Father") is the father of J.C. ("the Child"). The Child was removed from Father's care after instances of physical abuse of the Child by Father. This abuse is consistent with Father's historical pattern of abusive and threatening behavior. Father's behavior has negatively impacted the Child's physical and mental well-being. In seeking the termination of Father's parental rights, the Indiana Department of Child Services ("DCS") expressed concern for the Child's safety and well-being due to Father's failure to adequately change his behavior or address the traumatic impact his behavior has had on the Child. On appeal, Father contends that DCS did not provide sufficient evidence to support the termination of his parental rights. We affirm.

# Facts and Procedural History

[2] The Child was born on July 28, 2006. Shortly after the Child's birth, the Child's mother died in a car accident. After the accident, Father was awarded custody of the Child. DCS became involved in the Child's life in July of 2014, after receiving a report that Father had left the then-seven-year-old Child home alone without any supervision. DCS filed a petition alleging that the Child was a child in need of services ("CHINS"). The Child remained in Father's care.

[3] On August 25, 2014, the juvenile court adjudicated the Child to be a CHINS. Father refused to participate in any of the court-ordered services, did not

maintain contact with DCS, and failed to notify DCS when he and the Child moved. DCS Family Case Manager ("FCM") Teresa Abel became concerned about the Child's stability and whether Father was providing the Child with adequate shelter and food.

[4] The Child was removed from Father's care on October 30, 2014, after the Child showed up at school with a black eye. The Child's injury was not consistent with the explanation given by the Child as to how he was injured. Father agreed to participate in services and the Child was eventually returned to Father's care.

[5] The Child was again removed from Father's care in April of 2015, after the Child disclosed at school that Father "had punched him in the side and slapped him in the face." Tr. Vol. II, p. 33. At this time, the Child admitted that Father had caused his previous black eye. The Child was returned to Father's care on December 19, 2015.

[6] The Child was removed from Father's care for a third time in March of 2016, after the Child reported that Father had struck him with a water jug, causing him to fall to the ground and that once he was on the ground, Father "proceeded to kick him and hit him." Tr. Vol. III, p. 63. FCM Christina Olejnik observed "a mark on [the Child's] forehead and a mark on his left cheek." Tr. Vol. III, p. 63. The Child was removed from Father's care and placed with his paternal aunt.

[7] On November 1, 2016, DCS filed a petition seeking the termination of Father's parental rights to the Child. During a three-day evidentiary hearing, DCS presented evidence indicating that (1) Father displayed a pattern of combative and threatening behavior; (2) Father physically abused both the Child and at least one other child; (3) although Father had made some progress, concerns remain about whether this progress would last as he had not addressed the trauma the Child suffered in relation to Father's anger issues and physical abuse; (4) despite his progress, Father was not to the point that he could adequately care for the Child and service providers could not give a time frame on when they believed Father might get to the point where they could recommend reunification; (5) the Child both desires and requires stability and a sense of finality; (6) termination of the Father's parental rights was in the Child's best interests; and (7) its plan was for the Child to be adopted by his paternal aunt. On February 27, 2018, the juvenile court issued an order terminating Father's parental rights to the Child.

# Discussion and Decision

[8] The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his parental responsibilities. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001),

*trans. denied*. Parental rights, therefore, are not absolute and must be subordinated to the best interests of the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[9] Father contends that the evidence is insufficient to sustain the termination of his parental rights to the Child. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*.

[10] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id*.

Father claims that DCS failed to present sufficient evidence to prove by clear and convincing evidence that:

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[; or]
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child....
> (C) termination is in the best interests of the child[.]

Ind. Code § 31-35-2-4(b)(2).

# I. Indiana Code Section 31-35-2-4(b)(2)(B)

It is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find either that (1) the conditions resulting in removal from or continued placement outside the parent's home will not be remedied, (2) the continuation of the parent-child relationship poses a threat to the child, or (3) the child has been adjudicated CHINS on two separate occasions. *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where the juvenile court determines that one of the above-mentioned factors has been proven and there is sufficient evidence in the record supporting the juvenile court's determination, it is not necessary for DCS to prove, or for the juvenile court to find, either of the other two factors listed in Indiana Code section 31-34-2-4(b)(2)(B). *See In re S.P.H.*, 806 N.E.2d at 882.

[13]     In concluding that the conditions leading to the Child's removal from Father's care were not likely to be remedied, the juvenile court found (1) Father has displayed a historic pattern of physical and emotional violence; (2) Father has an explosive personality, which he has not been able to get under control; (3) Father's therapist indicated that Father had issues with anger and communication; (4) engagement and interactions between Father and the Child were lacking with Father focused mainly on himself and the Child being nonchalant about Father; (5) Father has shown no improvement with regards to his anger issues or managing his emotions; (6) service providers cannot recommend that the Child be placed with Father as face to face interactions between the Child and Father would require supervision due to concerns for the Child's safety; (7) given Father's narcissist personality disorder, change is unlikely to happen; and (8) Father is "far from having the ability to properly parent and respond to life stressors in a reasonable manner." Appellant's App. Vol. II, p. 34. Given these findings, the juvenile court concluded both that Father was not ready to parent the Child without outside help and Father's anger issues were not likely to go away given "his chronic inappropriate responses to outside stressors." Appellant's App. Vol. II, p. 34. The juvenile court also concluded that although Father may have made some progress, his progress was "too minimal and too late." Appellant's App. Vol. II, p. 35. The juvenile court's findings and conclusions are supported by the record.

[14]     Testimony established that Father has repeatedly engaged in violent and threatening behaviors. Father has physically abused numerous members of his

family, including the Child. In fact, the Child was removed from Father's care on three separate occasions, with each removal corresponding to an act of physical abuse of the Child by Father. Father has also displayed a pattern of threatening behavior toward service providers. Specifically, he threatened to shoot FCM Abel and has been verbally abusive towards case managers, his therapists, and the Child's court-appointed special advocate ("CASA").

[15] "A pattern of repeated abuse is relevant to a determination that a reasonable probability exists that the condition will not be remedied." *Lang v. Stark Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007). Importantly, the testimony establishes that while Father may have made some progress in the months before the evidentiary hearing, Father had yet to adequately address the trauma the Child suffered in relation to Father's anger issues and physical abuse. In addition, Father had not yet progressed to the point where service providers were confident that he could adequately care for the Child. For his part, the Child had expressed that he was afraid to be in the same room as Father without another adult present. Service providers acknowledged continued concerns for the Child's safety when with Father and indicated that they could not give a time frame on when they believed Father might progress to the point where they could recommend reunification. The evidence is sufficient to prove that the conditions leading to the Child's removal from Father's care were not likely to be remedied. Father's claim to the contrary amounts to an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

## II. Indiana Code Section 31-35-2-4(B)(2)(C)

[16] We are mindful that in considering whether termination of parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the juvenile court must subordinate the interests of the parent to those of the child involved. *Id.* "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the [child]." *Lang*, 861 N.E.2d at 373. Furthermore, this court has previously determined that the testimony of the case worker, guardian ad litem ("GAL"), or a CASA regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride*, 798 N.E.2d at 203; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied.*

[17] FCM Olejnik testified that she believed the termination of Father's parental rights was in the Child's best interests. FCM Olejnik explained that although Father had recently indicated that he was "open to making a change," she did not believe that Father had adequately addressed the trauma that the Child suffered in relation to Father's anger issues and physical abuse or progressed to the point that he could adequately care for the Child. Tr. Vol. III, p. 68. FCM Olejnik further explained that the Child was "concerned that any point, he could be returned home and he's afraid of that." Tr. Vol. III, p. 68. The Child has responded well to the stability he feels in his current pre-adoptive placement and has indicated that he "feels safe there." Tr. Vol. III, p. 69. Likewise, the

Child's therapist Ronald Mosby testified that reunification was "not something that [he] would recommend." Tr. Vol. III, p. 20. Mosby acknowledged that the Child expressed a desire for the case to come to an end and stated that it would be in the Child's best interest "to have some finality in these proceedings." Tr. Vol. III, p. 39. In terms of permanency, Mosby opined that continued placement in his current pre-adoptive home was "in [the Child's] best interests, due to the fact of, it gives him stability. He feels safe there … it gives him a place that he's secure at." Tr. Vol. III, p. 21. The testimony of FCM Olejnik and Mosby regarding the Child's need for permanency is sufficient to sustain the juvenile court's finding regarding the best interests of the Child. *See McBride*, 798 N.E.2d at 203.

[18] The judgment of the juvenile court is affirmed.

Bailey, J., and Mathias, J., concur.