Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

Feb 05 2013, 10:02 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ERIN L. BERGER**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
Department of Child Services
Central Administration
Indianapolis, Indiana

**D. CHAD JOHNSON**
DCS, Warrick County
Boonville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF D.B., MINOR CHILD, AND HIS MOTHER, J.B., | ) ) ) ) ) | |
| J.B., | ) ) | |
|     Appellant-Respondent, | ) ) | |
|        vs. | ) ) | No. 87A01-1207-JT-336 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
|     Appellee-Petitioner. | ) ) | |

APPEAL FROM THE WARRICK CIRCUIT COURT
The Honorable David O. Kelley, Judge
Cause No. 87C01-1007-JT-133

**February 5, 2013**

**BRADFORD, Judge**

Appellant-Respondent J.B. ("Mother") appeals the juvenile court's order terminating her parental rights to D.B. Mother alleges that the Indiana Department of Child Services ("DCS") did not provide sufficient evidence to support the juvenile court's finding that the conditions which resulted in D.B.'s placement outside of her home were not likely to be remedied. Concluding that the evidence was sufficient to support the termination of Mother's parental rights, we affirm.

## FACTS AND PROCEDURAL HISTORY

Mother, born on March 29, 1987, began using marijuana at the age of ten. By the age of twelve, Mother was using marijuana every other month, drinking alcohol two to three times per year, and had used "Ritalin, nerve pills, and speed pills." Ex. 2, Dec. 7, 1999, Assessment Summary. As a child, Mother was suspended from school for possession of cigarettes, fighting, and when she "flashed" her class. Ex. 2, December 7, 1999, Assessment Summary. Mother was eventually expelled from junior high school for marijuana possession. Ex. 2, Jan. 25, 2000, Termination Summary.

Mother gave birth to D.B. on February 20, 2008. On April 6, 2009, DCS officials received a report that Mother was under the influence of some intoxicant and with D.B. at a house where a methamphetamine lab was being investigated. A DCS case manager conducted an assessment and observed that Mother appeared to be impaired. A drug screen of Mother indicated the presence of methamphetamine, amphetamine, benzodiazepine, THC, and MDMA. D.B. was removed from Mother's care, and, on April 8, 2009, DCS filed a

petition alleging that D.B. was a child in need of services ("CHINS").

On May 5, 2009, Mother began treatment at Southwestern Behavioral Healthcare. On May 13, 2009, Mother admitted the allegations in the CHINS petition. On June 5, 2009, Mother admitted in a therapy session that she had relapsed by drinking alcohol. On July 6, 2009, the juvenile court issued a dispositional order, providing, in part, as follows:

1. The child shall continue in placement with the great uncle and aunt in Chandler, Indiana.
2. [Mother] shall participate in an assessment evaluation with Ireland & Luzio in order to determine what type of services she may need to participate in and she shall follow any recommendations as a result of the assessment.
3. [Mother] shall submit to random drug screens.
4. [Mother] shall continue to attend drug classes at Southwestern Behavioral Healthcare and attend NA/AA meetings and locate a sponsor.

Ex. 1, Dispositional Order.

On November 12, 2009, DCS issued a progress report. DCS Case Manager Lanette Crawford noted in the report that Mother was not returning calls from Crawford or the court-appointed special advocate ("CASA") and had been dismissed twice from the Extended Outpatient Group at Southwestern due to poor attendance and had not attended since August 2, 2009. Attached to the progress reports were results of Mother's recent drug screens. On July 13 and 30, 2009, Mother tested positive for THC and, on August 27, positive for methamphetamine and amphetamine. Mother failed to submit to requested screens on July 28 and August 12, 2009. On November 4, 2009, Mother checked herself into an in-patient treatment program, but she checked out the next day. On November 18, 2009, the juvenile court ordered that all future visitation would occur in DCS offices, Mother would submit to

drug screens before visitation could occur, and Mother must undergo substance abuse treatment. On March 4, 2010, Mother was charged with Class A misdemeanor marijuana possession. On April 1, 2010, Mother was charged with another count of Class A misdemeanor marijuana possession.

DCS Case Manager Ashley McReynolds filed a progress report on April 5, 2010. In the report, Case Manager McReynolds detailed the results of Mother's recent drug screens:

| | |
|---|---|
| 11/19/09 | Positive for Amphetamine, Methamphetamine, Benzodiazap[]ene, and Marijuana |
| 12/16/09 | Positive for Amphetamine, Methamphetamine, and Marijuana |
| 12/21/09 | Positive for Benzodiazap[]ine and Marijuana |
| 12/29/09 | Positive for Amphetamine, Methamphetamine, and Marijuana |
| 01/11/10 | Positive for Marijuana |
| 01/13/10 | Positive for Amphetamine, Methamphetamine, and Marijuana |
| 2/10/10 | Positive for Amphetamine, Methamphetamine, and Marijuana |
| 2/17/10 | Negative |
| 2/19/10 | Positive for Marijuana |
| 3/01/10 | Positive for Marijuana |
| 3/12/10 | Positive for Marijuana |
| 3/15/10 | Positive for Marijuana |
| 3/24/10 | Positive for Marijuana |

Ex. 1, April 5, 2010, Progress Report.

In the first few days of April of 2010, Mother used marijuana, methamphetamine, Xanax, and Oxycontin. On April 7, 2010, Mother again entered a treatment program but was released when she tested positive for methamphetamine on April 15, 2010. On August 2, 2010, Mother was charged with Class B misdemeanor public intoxication. On September 2, 2010, DCS filed a petition to terminate Mother's and Father's parental rights ("TPR petition").

On September 8, 2010, Case Manager McReynolds filed another progress report.

Case Manager McReynolds noted that Mother had not sought any additional treatment for addiction since April of 2010 and that "services have not been successful because [Mother] does not follow through with the programs." Ex. 1, September 8, 2010, Progress Report. The progress report also detailed several incidents involving Mother and D.B.'s father B.B. ("Father"). On May 7, May 12, May 15, July 6, August 1, and August 24, 2010, Boonville police responded to domestic disputes involving Mother and Father. On the last date, after an afternoon and evening of drinking, Mother struck Father in the head with a beer mug at a bar, causing a gash that required sixteen stitches. In a case plan also filed on September 8, Case Manager McReynolds indicated that DCS intended to pursue the termination of Mother's and Father's parental rights and secure D.B.'s adoption by his great-aunt and great-uncle, with whom he had been placed since April 8, 2009. On September 9, 2010, CASA Megan Cusic recommended that termination of Mother's and Father's parental rights to D.B. should be pursued as a permanency plan. On September 24, 2010, the juvenile court issued an order indicating that the target date for D.B.'s adoption was February 15, 2011. Also that day, Mother pled guilty to all three of her outstanding criminal charges and was sentenced to consecutive terms of reporting probation, which, in aggregate, would continue until August of 2013.

Case Manager McReynolds filed a progress report on February 11, 2011. Case Manager McReynolds reported that in October of 2010, Mother began to participate in classes at Southwestern Behavioral Healthcare. As of the date of the report, Mother had been taking drug screens but no results were known. Case Manager McReynolds also noted that

5

Mother and Father had been involved in several additional domestic disputes since August of 2010, but that they had stopped calling police because the police were reporting the incidents to DCS.

Meanwhile, supervised visitation with D.B. had resumed in November of 2010. In early April of 2011, Mother had one unsupervised visit with D.B. but visitation was suspended when Mother went to Florida with Father and was unable to return. Mother and Father were both on probation at the time and had left the state without telling their probation officer. On April 15, 2011, the State filed a petition to revoke Mother's probation for missing a probation appointment while in Florida. Mother ultimately was arrested and returned to Indiana. Mother tested positive for methamphetamine in a hair sample collected on May 11, 2011. On July 22, 2011, another hair sample was taken from Mother and tested positive for methamphetamine. On July 29, 2011, the State filed a second petition to revoke Mother's probation. On September 12, 2011, Mother admitted the allegations in the second petition to revoke her probation and was sentenced to inpatient treatment at a facility named Stepping Stone to be followed by placement at the Stepping Stone halfway house, the YWCA, or a facility named Ruth's House. The juvenile court began a hearing on DCS's TPR petition on September 13, 2011. At the hearing, Mother admitted that she had used methamphetamine in April or May of 2011.

The hearing on the TPR petition continued on April 25, 2012. Case Manager McReynolds testified that Mother had not visited with D.B. since July of 2011, when visitation was suspended. During the June and July visitations, D.B. "reacted pretty

6

negatively[,] reverting completely back in his potty training" and becoming physically aggressive toward others. April 25, 2010, Tr. p. 30. Case Manager McReynolds also testified that D.B.'s negative behaviors ceased when visitation was suspended, he was doing "[v]ery well" in his current placement, and it would be in his best interests to be adopted. April 25, 2010, Tr. p. 30. CASA Cusic testified that the termination of Mother's parental rights to D.B. was in his best interests based on the length of time D.B. had been placed away from Mother and "[t]he inconsistency and instability of her history[.]" April 25, 2010, Tr. 89. CASA Cusic admitted that Mother was making progress in her current placement at the YWCA but noted that Mother had already been in rehabilitation programs seven or eight times in the past and had relapsed after completing the previous program in which she had participated.

A final hearing on the TPR petition was held on May 31, 2012. Mother, who was still placed in the YWCA at that point, admitted that her presence at the YWCA was a condition of her probation and that the alternative was jail. On June 28, 2012, the juvenile court ordered the termination of Mother's parental rights in D.B., finding, *inter alia*, that D.B. had been removed from Mother for fifteen of the previous twenty-two months, there was a reasonable probability that the conditions that resulted in D.B.'s removal would not be remedied, continuation of the parent-child relationship posed a threat to D.B.'s well-being, and termination was in D.B.'s best interests.[1]

## DISCUSSION AND DECISION

[1] Father ultimately did not contest the termination of his parental rights and does not participate in this appeal.

The Fourteenth Amendment to the United States Constitution protects the traditional rights of a parent to establish a home and raise his children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the

8

juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

(A) one (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
(B) that one (1) of the following is true:
(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
(ii) There is a reasonable probability that the continuation of the

9

parent-child relationship poses a threat to the well-being of the child.
(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Specifically, Mother claims that DCS failed to establish that the conditions that resulted in D.B.'s removal or the reasons for his placement outside of her care will not be remedied and that continuation of the parent-child relationship posed a threat to D.B. We note that Indiana Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive, so the juvenile court need only find *either* that the conditions resulting in removal would not be remedied or that the continuation of the parent-child relationship posed a threat to the child. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. We need only address Mother's first contention on appeal.

In order to determine that the conditions that led to from the parent's care will not be remedied, the juvenile court should first determine what conditions led DCS to place D.B. outside of Mother's care, and, second, whether there is a reasonable probability that those conditions will not be remedied. *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside his parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A

10

juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)).

When considered as a whole, we conclude that the evidence is sufficient to demonstrate a reasonable probability that the conditions which resulted in D.B.'s continued placement outside Mother's care will not be remedied. Mother has a long history of substance abuse, dating back to the age of ten, that involves, *inter alia*, the use of hard drugs such as methamphetamine and Oxycontin, several failed attempts at rehabilitation, and three criminal convictions, and which has contributed to several incidents of domestic violence. Over the approximately three-year course of this case, Mother tested positive for illegal drugs at least eighteen times, and attempts at rehabilitation failed seven or eight times. Brief periods of progress would always be followed by relapse. Mother points to evidence that, as of May 31, 2012, she was working and had been compliant with the YWCA rehabilitation program. The juvenile court noted, however, that she had gone to the YWCA as a condition of her probation under court order. The juvenile court concluded that Mother "ha[d] yet to demonstrate that she can remain drug free, hold a job and provide for her son without the threat of imprisonment[,]" a conclusion that we cannot find to be clearly erroneous. Order p. 2. Mother's claim effectively amounts to an invitation for this court to reweigh the evidence,

11

which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879. Under these circumstances, we cannot say that the juvenile court erred in determining that DCS established that it is unlikely that the conditions resulting in the Children's placement outside of Mother's care would be remedied. *See In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997).

The judgment of the juvenile court is affirmed.

NAJAM, J., and FRIEDLANDER, J., concur.