**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Jun 18 2013, 6:19 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**PHILIP R. SKODINSKI**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
Department of Child Services
Central Administration
Indianapolis, Indiana

**SHARON R. ALBRECHT**
DCS, St. Joseph Local County Office
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF J.C. and R.C., Jr., MINOR CHILDREN, AND THEIR MOTHER AND FATHER, S.C. and R.C., Sr, | ) ) ) ) ) ) | |
| S.C. & R.C., Sr., | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 71A03-1211-JT-501 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE ST. JOSEPH PROBATE COURT
The Honorable Peter J. Nemeth, Judge
Cause Nos. 71J01-1206-JT-38, 71J01-1206-JT-39

**June 18, 2013**

**BRADFORD, Judge**

Appellants-Respondents S.C. ("Mother") and R.C., Sr. ("Father") (collectively, "the Parents") appeal the juvenile court's order terminating their parental rights to J.C. and R.C., Jr. (collectively, "the Children"). Parents allege that the Indiana Department of Child Services ("DCS") did not provide sufficient evidence to support the juvenile court's determination that termination was in the children's best interests and that DCS did not adequately provide services to them or assist in obtaining out-of-state services. We affirm.

## FACTS AND PROCEDURAL HISTORY

On November 8, 2011, five-year-old J.C. and three-year-old R.C., Jr., were found by South Bend Police wandering alone in the street one-half mile from their home. When police escorted the Children home, Mother took at least one-half hour to answer the door, and police found the home to be extremely messy with objects, trash, and dirt littering the floor and countertops. Neither of the Children appeared to have bathed recently; the Children's feet were black with dirt; and R.C., Jr.'s, pull-up diaper had dirt and grease on it and appeared to be soiled with urine. The November 8 incident was the third time in 2011 that DCS had responded to the home following a report of the Children being found away from the home. DCS removed the Children from Parents' care and petitioned to have the children found to be children in need of services ("CHINS").

On November 10, 2011, both Parents admitted the allegations in the CHINS petition, and the juvenile court adjudicated them to be CHINS. On December 12, 2011, the juvenile

2

court issued its dispositional decree, ordering therapy, visitation, and continued foster care for the Children, and ordering the Parents to participate in the following services: visitation, individual therapy, family therapy, psychological evaluation, and home-based case management. In addition, the juvenile court ordered Mother to complete a psychiatric medical evaluation and random drug screens.

During the December 12, 2011, dispositional hearing, Parents informed the juvenile court of their intention to move to Alabama. The juvenile court advised Parents that the children would remain in St. Joseph County during the CHINS proceeding and that failure to participate in services might lead to the termination of parental rights.

### *Psychological Evaluation of Parents*

In January of 2012, psychologist Alan Wax, Ph.D., evaluated Parents. Dr. Wax noted that Father grew up with an absentee father who was physically abusive. Father had many rules and was "very set in terms of roles … and not being very tolerant of deviations from the role." Tr. p. 15. Father was adamant about not wanting to help Mother maintain the home and said that he "had to put her out of the house a few times because she wasn't towing the line[.]" Tr. p. 16. Dr. Wax was also concerned about Father's reunification plan, which was to have a friend in Alabama parent the Children for an unspecified period of time. Because of Father's vagueness, Dr. Wax referred to the plan as "tenuous and vague[.]" Tr. p. 17. Dr. Wax also noted that Father viewed corporal punishment as "a primary disciplinary method." Tr. p. 18.

As for Mother, Dr. Wax noted that Mother had been raised in "quite an unstable and

3

chaotic environment [with] neglect and drug use by [Mother's] mother and [Mother] was removed by DCS[.]" Tr. p. 21. Dr. Wax expressed concern regarding Mother's "strong dependency needs and her depression[,]" noting that Mother has attempted suicide at least once. Tr. p. 23. Dr. Wax also expressed concern about Mother's relationship with Father, pointing to the following statement from Mother:

> He's an emotional abuser. He calls me names and cuts me down all the time. He tells me I'm worthless. He cusses at me. He calls me a lazy bitch and uses the F word on me. He's called me every name under the sun. I stay with him because I love him and for the kids, but he does it in front of the kids. There have been times when my daughter has said to him, "stop yelling at mommy" and "stop, you're making mommy cry."

Tr. p. 24.

Finally, Dr. Wax was concerned about Mother's denial regarding the state of her home. Dr. Wax recommended that Mother participate in a medication consultation to determine if there was any medication that could help her manage her depression. Dr. Wax could not recommend reunification with the Children until Parents resolved their issues.

### *The Children's Behavior*

Licensed Social Worker ("LSW") Kristina Elsbury worked with the Children from December of 2011, until July of 2012. At the first session, the foster mother told Elsbury that the Children were howling, Elsbury noted "[a] lot of guttural sounds" and "grunting" from J.C., and that J.C. drew "naked pictures with the body parts[.]" Tr. p. 87. At the same session, Elsbury engaged in play therapy with R.C., Jr., using a dollhouse. R.C., Jr., would put things in the "basement" "and would go over the word bad, bad; that somebody had been bad and [been] put … in the basement." Tr. p. 88. When Elsbury asked R.C., Jr., "what

4

happens with the man in the basement[,]" he replied, "don't worry I'll get the knife." Tr. p. 88. When Elsbury played as though a dog had urinated on the floor, R.C., Jr., "took the dog, put him in the basement and locked the door." Tr. p. 89. At the next session, J.C. drew a picture of R.C., Jr., being put into the basement and said that there was a monster in the basement. R.C., Jr., needed to have all of the doors unlocked in any room he entered and would check all of the locks. In January and February of 2012, Elsbury noticed that the Children were regressing and recommended that visitation with Parents be suspended. In Elsbury's opinion, the regression was related to the visitation, and she noticed that they improved after visitation was suspended on March 7, 2012. Elsbury opined that the termination of Parents' rights to the Children is in Children's best interest.

Andrea Smith, a Family Specialist through the Children's foster care agency, began working with the Children in June of 2012. J.C. began kindergarten in 2012 but was unable to attend the full day due to behavioral problems and required an aide to be with her. J.C. pulled her teacher's hair, would not sit still, and would run away and hide. On one occasion at the end of August of 2012, J.C. was playing with two dolls in kindergarten and positioned one of the dolls' faces in the crotch of the other. J.C. said that "she was tasting daddy." Tr. p. 33. J.C. also exhibited behavioral problems in her foster home, running and hiding, failing to make eye contact, and once slapping her foster mother's granddaughter. On several occasions, J.C. would unlock doors in the foster home "to get in and see like someone taking a shower." Tr. p. 35.

Smith also observed behavioral problems in R.C., Jr. who would throw temper

5

tantrums several times an hour and would not look Smith in the eye. Both children employed rocking "as a soothing or coping strategy [and] both rocked a lot when [Smith] first started with them." Both Children were still experiencing toilet-training accidents when Smith began working with them. By October of 2012, the Children's behaviors had improved. *Inter alia*, the frequency of R.C., Jr.'s, tantrums and both Children's rocking had significantly decreased and neither child had had an accident for several months.

DCS Family Case Manager Courtney Marek began working with the Parents and Children in November of 2011 and took over the case the next month. After their removal on November 8, 2011, the Children's first foster care placement lasted a mere ten days because the foster parents felt that they could not provide for the Children. The Children did not respond well to structure, would "lash out[,]" and were aggressive toward adults and one another. Tr. p. 50. The Children's second foster care placement lasted from November 18, 2011, to April 27, 2012, when they were removed because the placement was not pre-adoption. During the second placement, J.C.'s foster mother became concerned with the relationship between J.C. and the foster father, reporting that "it was seeming kind of eery [sic] how close she wanted to be to the foster father." Tr. p. 52. The foster mother also reported that J.C. would play with her breasts and, when redirected, replied that "my mom lets me do it[.]" Tr. p. 52.

As previously mentioned, visitation with the Parents was suspended on March 7, 2012, at the request of DCS, due to concern regarding "sexually reactive behaviors" by J.C. Tr. p. 54. J.C. had touched another student's "private parts[,]" told a therapist that the other

6

student and "her daddy own her body[,]" discussed watching Father "wipe his bottom[,]" and was able to draw anatomically-correct penises. Tr. p. 54. Moreover, after visitation with Parents, J.C. would defecate on her bedroom floor. The behaviors have subsided since the termination of visitation. The Children had a "respite" third placement until May 2, 2012, before being placed with pre-adoptive foster parents. Tr. p. 51. Apparently during the respite, J.C. was physically aggressive to the foster parents, and R.C., Jr., was "hoarding things, taking things out of the trash and keeping them in his pocket, [and] taking things from other people's rooms[.]" Tr. p. 52. As of October 19, 2012, the Children had not seen Parents since March, and "a lot of the negative behaviors have decreased." Tr. p. 65. Case manager Marek opined that continuing the parent/child relationships between Parents and Children was a threat to Children's well-being.

### *The Move to Alabama and Compliance with Services*

Meanwhile, Father moved to Alabama in January of 2012, and Mother followed in March. Parents testified that they moved to Alabama for the following reasons: (1) Father was laid off from his Indiana job, (2) a lower cost of living and crime rate, (3) Father had friends there, (4) Father was hired by a trucking company in December of 2011, (4) Parents did not have credit or a home in Indiana, (5) Parents could not afford to rent in South Bend, (6) Parents felt committed to purchasing land in Alabama because their real estate agent had located a property, and (7) Father signed a contract to rent a home for one month and then purchase the home when Parents' money was released from Indiana. Parents' request that the juvenile court terminate the CHINS case because of their relocation was denied on

7

February 1, 2012. To Case Manager Marek's knowledge, however, Parents never attempted to find work or housing in the South Bend area.

As for compliance with court-ordered services, Parents attended visitation regularly until Father moved to Alabama in January of 2012. Parents both attended their initial psychological evaluations, and it was ultimately recommended that Mother begin taking an anti-depressant and continue therapy. Although Mother began taking an anti-depressant after moving to Alabama, she does not attend therapy regularly. As of October 19, 2012, Case Manager Marek had neither received any records of Father's employment nor any information regarding Parents' housing other than an address.

On June 12, 2012, the State filed a petition to terminate Parents' parental rights to Children. At the time, Parents "hadn't really completed any therapy services, and so [DCS] didn't have any professional recommendations sharing that they made progress or they hadn't made progress[.]" Tr. p. 64. As of October 19, 2012, the Parents' compliance with services was similar to what it had been in June, with "[j]ust a few sessions … completed, nothing significant and no professional report stating that any progress had been made." Tr. p. 64.

The juvenile court held a hearing on the termination petition on October 19, 2012. On November 2, 2012, the juvenile court issued an order terminating Parents' parental rights to the Children. The juvenile court's order reads, in part, as follows:

> There is a reasonable probability that the conditions resulting in the removal of the children from the parents' home will not be remedied.
> There is a reasonable probability that a continuation of the parent-child relationship will pose a threat to the well-being of the children.
> It is in the best interest of the children that the parent-child relationship be terminated.

> The St. Joseph County [DCS] has a satisfactory plan for the care and treatment of the children which is Adoption[.]

Appellant's App. p. 15.

## DISCUSSION AND DECISION

### *Standard of Review*

The Fourteenth Amendment to the United States Constitution protects the traditional rights of a parent to establish a home and raise his or her children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental*

9

*Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

(A) one (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
(B) that one (1) of the following is true:

10

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

## I. Whether DCS Presented Sufficient Evidence to Sustain the Probate Court's Termination of Parental Rights

Parents challenge the juvenile court's conclusion that termination of their parental rights is in the Children's best interests.

> We are mindful that in determining what is in the best interests of the children, the court is required to look beyond the factors identified by the office of family and children, and look to the totality of the evidence. In so doing, the trial court must subordinate the interests of the parents to those of the children. The trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. In addition, this court has previously determined that the testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests.

*McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003) (citations omitted).

We conclude that DCS produced sufficient evidence to support a conclusion that termination of parental rights is in the best interests of the Children. DCS produced copious evidence that both Children exhibited disturbing behaviors when removed from Parents' home, a situation that has steadily improved since. When removed, both Children had

11

aggression, anger, and toilet-training issues and engaged in frequent rocking and howling. On several occasions, J.C. engaged in inappropriate sexual behavior, including touching a classmate's genitals, fondling her foster mother's breasts, and posing dolls in a position consistent with oral sex, explaining that she was "tasting daddy." Upon removal, R.C., Jr., threw several temper tantrums per hour and was unable to enter a room without ensuring that none of the doors were locked. DCS presented evidence that these behaviors grew worse when Parents exercised visitation with the Children and improved after visitation was suspended in March of 2012. LSW Elsbury, Family Specialist Smith, and Case Manager Marek all testified that the Children's disturbing behaviors had improved since removal and, especially, since the suspension of visitation. This evidence supports a conclusion that termination is in the Children's best interests.

Moreover, DCS produced substantial evidence that Parents had done little to address their parenting issues. Although there is evidence that Mother is now taking medicine to address her depression, she does not regularly attend individual therapy. Because Parents have failed to complete any services in Alabama, Case Manager Marek was unable to determine if Parents had made any progress. DCS has been provided with scant information regarding Parents' employment and housing.

Finally, DCS presented testimony regarding the Children's need for permanency and how it was being provided to them in their current placement. Specifically, LSW Elsbury opined that:

> The children need a home where they're not going to feel they have to run
> away multiple times and have to be returned by the police, where there is no

12

possibility of sexual abuse or physical abuse or neglect and where they know they're safe and loved and where accountability for being provided therapy and stability is paramount so they can grow up, you know, in a healthy, safe, loving environment.

Appellant's App. pp. 100-01.

Parents point to their testimony that Children exhibited no troubling behaviors before removal and suggest that placement in foster care is the cause of the behaviors. Parents' argument in this regard amounts to nothing more than an invitation to reweigh the evidence, which we will not do. The juvenile court's conclusion that termination is in the Children's best interests is supported by the record.

## II. Whether DCS Violated Parents' Rights to Due Process

## A. Provision of Services

Parents argue that DCS violated their rights to due process by failing to provide services to them in Indiana or Alabama. There is no indication, however, that Parents raised this issue below or otherwise brought it to the juvenile court's attention; consequently, they have waived this argument for appellate consideration. *See, e.g.*, *McGill v. Ling*, 801 N.E.2d 678, 687 (Ind. Ct. App. 2004) ("Generally, a party may not raise an issue on appeal that was not raised to the trial court[.]"), *trans. denied*. Moreover, as DCS points out, the provision of reasonable efforts to reunify a child with his or her family is required in a CHINS proceeding, but not in a termination proceeding. *See* Ind. Code Art. 31-34 ("Children in Need of Services"). "[T]he provision of family services is not a requisite element of our parental rights termination statute, and thus, even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require

13

reversal." *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000). Parents' due process rights were not violated in this regard.

### B. Refusal to Transfer CHINS Case to Alabama

Parents also argue that the juvenile court denied them due process in denying their request to transfer the CHINS case to Alabama when they moved there. Parents, however, provide no standard of review for this claim and do not cite any authority for the proposition that a CHINS case must be transferred to another state in the event of a voluntary move. "It is well settled that we will not consider an appellant's assertion on appeal when he has failed to present cogent argument supported by authority and references to the record as required by the rules." *Shepherd v. Truex*, 819 N.E.2d 457, 463 (Ind. Ct. App. 2004). "If we were to address such arguments, we would be forced to abdicate our role as an impartial tribunal and would instead become an advocate for one of the parties." *Id*. "This, clearly, we cannot do." *Id*. Parents have waived this argument for appellate review.

The judgment of the juvenile court is affirmed.

RILEY, J., and BROWN, J., concur.