## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jun 29 2015, 8:52 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Mark A. Delgado
Delgado Law Office, PC
Monticello, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of M.R., Minor Child and Her Father, J.R.,

J.R.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

June 29, 2015

Court of Appeals Case No. 38A02-1404-JT-236

Appeal from the Jay Circuit Court
The Honorable Brian D. Hutchinson, Judge
Trial Court Cause No. 38C01-1206-JT-1

**Bradford, Judge.**

# Case Summary

[1] Appellant-Respondent J.R. ("Father") appeals the juvenile court's order terminating his parental rights to M.R. (the "Child"). In August of 2010, the Department of Child Services ("DCS") filed a petition alleging that the Child was a child in need of services ("CHINS"). On September 20, 2010, the Child was adjudicated to be a CHINS, following Father's admission to this effect. DCS subsequently filed a petition seeking the termination of Father's parental rights to the Child. Following an evidentiary hearing, on September 28, 2012, the trial court issued an order terminating Father's parental rights to the child.

[2] Father did not file a timely appeal of the trial court's order, and, on November 12, 2013, the trial court finalized the Child's adoption by the Child's then-foster parents. Father filed a petition seeking permission to file a belated appeal of the trial court's September 28, 2012 termination order. This request was initially denied, but was subsequently allowed pursuant to order of the Indiana Supreme Court. On appeal, Father contends that DCS did not provide sufficient evidence to support the termination of his parental rights. We affirm.

# Facts and Procedural History

[3]     The Child was born to Father and L.P. ("Mother") (collectively, the "parents") on February 18, 2010.[1] DCS became involved with the family in August of 2010, when the Child's parents became homeless. At that time, DCS filed a CHINS petition and placed then-six-month-old Child with her paternal grandmother. On September 20, 2010, the Child was adjudicated to be a CHINS following the parents' admission to the allegations set for in the CHINS petition. The juvenile court ordered that the Child be returned to her parents' care, so long as parents met certain requirements. Specifically, the juvenile court ordered the parents to participate in home-based therapy and homemaker services, attend all scheduled appointments with case workers and service providers, provide suitable housing and a legal source of income for the Child, and complete an anger-management assessment and comply with and follow any treatment recommendations.

[4]     In March of 2011, DCS again removed the Child from her parents' home after both parents were arrested on drug-related charges. On March 10, 2011, Father was charged with Class D felony unlawful sale of legend drugs, Class A felony dealing in a Schedule II controlled substance, Class D felony dealing in a substance represented to be a controlled substance, and Class A felony dealing in a Schedule III controlled substance. Father subsequently pled guilty to Class

---

[1]  The termination of Mother's parental rights is not at issue in this appeal. We will therefore limit our discussion to Father where possible.

B felony dealing in a Schedule III controlled substance and was sentenced to a ten-year term of incarceration in the Department of Correction.

[5] Approximately three weeks after the Child was removed from her parents' care, on April 4, 2011, the Child was removed from paternal grandmother's care after paternal grandmother notified DCS that she was not physically able to care for the Child any longer. Upon being removed from her paternal grandmother's care, the Child was placed with her foster parents. She has continually lived with foster parents since that time.

[6] On June 5, 2012, DCS filed a petition seeking the termination of Father's parental rights to the Child. The juvenile court conducted an evidentiary termination hearing on September 25, 2012. During the termination hearing, DCS introduced evidence relating to concerns regarding Father's continued inability to provide proper care for the Child. Specifically, DCS introduced evidence which demonstrated that Father was incarcerated with an earliest possible release date of sometime in November of 2016 and Father had a history of unstable housing, domestic violence, and drug dealing. Further, although Father claimed that he was willing to participate in any services required by DCS upon his release, it was unclear when, if ever, Father would be in a position where he could provide the Child with the necessary proper care. DCS also introduced evidence indicating that the termination of Father's parental rights was in the Child's best interests and that its plan for the permanent care and treatment of the Child was adoption. Father, for his part, presented evidence which he claimed demonstrated that he had made a good-

faith effort to better himself while in jail and that he had a bond with the Child. Father also reiterated that he would be willing to participate in any services required by DCS upon his release from prison. On September 28, 2012, the juvenile court issued an order terminating Father's parental rights to the Child. (Appellant's App. 9-11) This belated appeal follows.[2]

# Discussion and Decision

The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests

---

[2] Mother filed a timely appeal from the juvenile court's September 28, 2012 termination order. With regard to Mother, we affirmed the juvenile court's termination order in a memorandum decision that was handed down on June 7, 2013. *See M.R. v. Ind. Dept. of Child Servs.*, 38A04-1211-JT-573 (Ind. Ct. App. June 7, 2013). Father, however, did not file a timely appeal of the juvenile court's September 28, 2012 termination order. On November 12, 2013, in Cause Number 18C01-1310-AD-26, the adoption court finalized the Child's adoption by her then-foster parents.

in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

[8] The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[9] Father contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating his parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*.

[10] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly

erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[11]     In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:
>
> > (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
> >
> > (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
> >
> > (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) termination is in the best interests of the child; and
>
> (D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011). Father does not dispute that DCS presented sufficient evidence to support the first, second, and fourth elements set forth in Indiana Code section 31-35-2-4(b). Father, however, does claim that DCS failed to establish the third element that is required to be proven before a court can order the involuntary termination of a parent's parental rights, *i.e.*, that termination of his parental rights was in the best interests of the Child.

## Best Interests of the Child

[12] Father contends that DCS failed to prove by clear and convincing evidence that termination of his parental rights was in the Child's best interests. We are mindful that in considering whether termination of one's parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the juvenile court must subordinate the interests of the parent to those of the child involved. *Id.* "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007) (citing *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)). "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). In

this vein, we have previously determined that the testimony of the case worker or Guardian Ad Litem ("GAL") regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride*, 798 N.E.2d at 203; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

[13]     With regard to the Child's best interests, the juvenile court found as follows:

> DCS has established by clear and convincing evidence that termination of the parent-child relationship is in [the Child's] best interests in that;
>
> a.     Her parents are unable to care for her;
>
> b.     Termination of the relationship will spare her the emotional trauma of eventual removal from the foster-home;
>
> c.     Her extended family have made no significant effort to provide her a home until the termination action was initiated in June 2012;
>
> d.     She is thriving in her present placement;
>
> e.     She is developing "perfectly" in the foster-home;
>
> f.     The foster-parents wish to adopt [the Child] and they assist her in her development daily; and
>
> g.     The foster-mother is a teacher and will be able to have considerable contact with [the Child] throughout her youth.

Appellant's App. p. 11. Father does not challenge these findings; he challenges only the conclusion that they support termination of his parental rights. We cannot agree.

[14]     The testimony establishes that the Child has a need for permanency and stability and that the termination of Father's parental rights would serve the

Child's best interests. Specifically, Supervising Case Manager Joy Woolf testified that she believed that the termination of Father's parental rights was in the Child's best interests. In support of this belief, Supervising Case Manager Woolf testified to her belief that "all children need permanency in their lives and they need to know where they're going to be living and they need to know who's going to be raising them and so they can be, grow up to be stable adults." Tr. p. 12. Supervising Case Manager Woolf further testified that the Child is at a critical point in her life when she needs stability and that "it would be harmful to [the Child] to pull up" the roots she has with her foster parents. Tr. p. 45.

[15] In addition, the Child's GAL, Tom Diller, testified that it was his opinion "given the background of that [which] brought us to this point and the condition of her now, that it is in her best interest if she were to have [Father's parental] rights terminated." Tr. p. 68. When asked if he believed that the Child could potentially suffer negative ramifications in the event that her placement with her foster parents were disrupted, GAL Diller further testified that:

> The quality of life that could be given to her at this point and when we have a choice, ordinarily we wouldn't intervene but she has a stable life right now and mom and dad both, for whatever reason, are in a very fluid state and it appears their [sic] not able to take care of themselves let alone a child.

Tr. p. 70.

[16] Again, in challenging the sufficiency of the evidence to support the termination of his parental rights, Father does not specifically challenge the opinions of Supervising Case Manager Woolf or GAL Diller. Instead, Father points to evidence and cites to case law which he claims demonstrate that termination of his parental rights was not in the Child's best interests. For instance, Father cites to evidence which he claims shows that he has made a good-faith effort to better himself by participating in the "Father Engagement Program" in the county jail, that he had a bond with the child prior to her removal from his care, and that he has displayed a willingness to comply with any reunification plan crafted by DCS after he is released from prison. Appellant's Br. p. 7.

[17] Father also argues that his case is similar to the situation presented in *G.Y.* In *G.Y.*, the Indiana Supreme Court acknowledged that permanency is a central consideration in determining the best interests of a child. 904 N.E.2d at 1265. However, the Indiana Supreme Court found that:

> In our case, however, G.Y. is under the age of five and Mother's release from prison is imminent. Particularly given the highly positive reports about the quality of the placement here, we are unable to conclude that continuation of the CHINS foster care arrangement here will have much, if any, negative impact on G.Y.'s well-being. We agree with Mother that "there was no evidence presented to show that permanency through adoption would be beneficial to [G.Y.] or that remaining as a foster care ward until he could be reunited with his mother would be harmful to [G.Y.]." (Appellant's Pet. to Transf. at 6.) This is especially true given the positive steps Mother has taken while incarcerated, her demonstrated commitment and interest in maintaining a parental relationship with G.Y., and her willingness to continue to participate in parenting and other personal improvement programs after her release.

> We do not find that G.Y.'s need for immediate permanency through adoption to be a sufficiently strong reason, either alone or in conjunction with the court's other reasons, to warrant a conclusion by clear and convincing evidence that termination of Mother's parental rights is in G.Y.'s best interests.

*Id*. at 1265-66.

[18]     Unlike in *G.Y.*, in the instant matter, Father's release from prison is not imminent. In fact, the record indicates that his earliest possible release date is in November of 2016. Supervising Case Manager Woolf stated that although there appeared to be a bond between the Child and Father when the Child was six months old before Father was incarcerated, she did not think the Child would know Father if they were in the same room because it has been so long since she has been around him. In addition, although Father claims that he successfully completed a parenting course while in prison and is willing to participate in any future services that DCS may deem necessary, Father has a history of unstable housing, domestic violence, and drug dealing. Specifically, Father and the Child were homeless when DCS first became involved with the family. DCS later learned that Father was dealing drugs and that some of his drug dealing activities took place while the Child was in the house. The record provides no indication of how long it would take, upon release from prison, for Father to address these concerns.

[19]     The juvenile court did not have to wait until the Child was irreversibly harmed such that her physical, mental, and social development was permanently impaired before terminating Father's parental rights. *See In re C.M.*, 675 N.E.2d

at 1140. Furthermore, the juvenile court, acting as the fact finder, was free to judge witness credibility and believe or not believe the witnesses as it saw fit. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *McClendon v. State*, 671 N.E.2d 486, 488 (Ind. Ct. App. 1996); *Moore v. State*, 637 N.E.2d 816, 822 (Ind. Ct. App. 1994), *trans. denied*. In light of the testimony of Supervising Case Manager Woolf and GAL Diller, considered with the Child's need for permanency and the uncertainty as to when, if ever, Father would be capable of providing the necessary care for the Child, we conclude that the evidence is sufficient to satisfy DCS's burden of proving that termination of Father's parental rights is in the Child's best interests. Father's claim to the contrary merely amounts to an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

# Conclusion

Having concluded that the evidence is sufficient to support the juvenile court's order terminating Father's parental rights to the Child, we affirm the judgment of the juvenile court.

The judgment of the juvenile court is affirmed.

Vaidik, C.J., and Kirsch, J., concur.