# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 17 2017, 7:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of: E.L., S.L., L.L., & I.L., (Minor Children)

and

J.K. (Mother),
*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 17, 2017

Court of Appeals Case No. 54A01-1609-JT-2158

Appeal from the Montgomery Circuit Court

The Honorable Harry A. Siamas, Judge

Trial Court Cause Nos.
54C01-1602-JT-44
54C01-1602-JT-45
54C01-1602-JT-46
54C01-1602-JT-47

**Bradford, Judge.**

# Case Summary

[1] Appellant-Respondent J.K. ("Mother") appeals the juvenile court's order terminating her parental rights to L.L., E.L., I.L., and S.L. (collectively "the Children"). On February 27, 2015, Appellee-Petitioner the Department of Child Services ("DCS") filed a petition alleging that the Children were children in need of services ("CHINS"). The Children were adjudicated to be CHINS on May 7, 2015. Mother was subsequently ordered to participate in certain services. Mother, however, failed to consistently do so.

[2] DCS filed a petition seeking the termination of Mother's parental rights to the Children on January 27, 2016. Following an evidentiary hearing, the juvenile court issued an order granting DCS's petition. On appeal, Mother contends that DCS did not provide sufficient evidence to support the termination of her parental rights. We affirm.

# Facts and Procedural History

[3] Mother and J.L. ("Father") are the biological parents of L.L., born on May 2, 2003; E.L., born on January 19, 2006; I.L., born on October 29, 2007; and S.L., born on October 6, 2010.[1] DCS initially became involved with the family in

---

[1] The Children's biological father is deceased.

2006 when the Children were removed from Mother's care after Mother was arrested and tested positive for marijuana and cocaine. This initial case "was closed mid to late 2007." DCS Ex. 1, p. 15. DCS also became involved with the family in June of 2013 after Father "passed away due to a heroin overdose." DCS Ex. 1 p. 16. At the time Mother tested positive for methamphetamine. This case was subsequently closed after DCS confirmed that Mother had family and community support in place.

[4] DCS again became involved with the family on February 25, 2015, after receiving a report which alleged that the Children were the victims of abuse and that the family's home had no electricity, heat, or water. It was also alleged that there may have been a methamphetamine lab present in the home. After receiving the report, at approximately 9:40 p.m., DCS Family Case Manager Itzyana Prieto ("FCM Prieto") responded to the home with members of the Crawfordsville Police Department and the Indiana State Police. Upon arriving at the home, the individual who answered the door indicated that Mother was not home but that he was watching the Children. The individual allowed FCM Prieto and the law enforcement officers to enter the home. Three other adults were also present in the home.

[5] FCM Prieto observed that while the home did have electricity and heat, there was no running water in the home. FCM Prieto noted that the home "was unfit and unsafe with clutter, lots of trash in the kitchen, piles of feces in the toilet and a strong odor coming from the bathroom, and dirty dishes piled in the sink." DCS Ex. 1, p. 11. FCM Prieto observed that the Children were sleeping

in a single bedroom with two of the children sleeping on the top bunk and the other two sleeping on the floor. FCM Prieto noted that the Children "smelled of a strong odor of urine." DCS Ex. 1, p. 11. FCM Prieto and the law enforcement officers subsequently discovered what appeared to be an active methamphetamine lab in the basement of the home. Given the conditions of the home together with the presence of the apparent methamphetamine lab, the Children were taken into DCS custody and Mother was placed under arrest.[2]

[6] On February 27, 2015, DCS filed petitions alleging that the Children were CHINS. On May 6, 2015, the juvenile court adjudicated the Children to be CHINS. Following a hearing, the juvenile court issued a dispositional order on June 8, 2015, in which it ordered that Mother shall (1) participate in a mental-health and substance-abuse intake and follow all of the recommendations, and (2) submit to random drug screens. The juvenile court instructed DCS to facilitate visitation between Mother and the Children.

[7] On September 25, 2015, the juvenile court issued an order of participation in which it found as follows:

> [Mother] has not participated … fully in services to help her reunify with her children. She has not consistently participated in home-based case management services to help them establish a home and employment. She continues to use illegal substances.

---

[2] Mother was subsequently charged with felony drug charges, including manufacturing and possession of methamphetamine; felony child neglect charges, and misdemeanor drug charges, including possession of paraphernalia and synthetic marijuana.

> She has not participated in substance abuse treatment or engaged in the individual therapy.

DCS Ex. 1, p. 38. In light of these findings, the juvenile court ordered Mother to: (1) initiate and participate in a course of individual therapy; (2) attend programs related to relapse prevention and any follow-up recommended substance-abuse treatment; (3) cooperate with DCS and service providers; (4) participate consistently in home-based case work and follow recommendations of the home-based case manager; (5) provide drug screens when requested by DCS or service providers; (6) participate in supervised visitation on a regular basis; (7) refrain from using illegal drugs and prescription medications which are not prescribed to her; (8) keep DCS and service providers informed as to her on-going criminal case, current address, and contact information; and (9) sign any necessary releases.

[8] Mother gave birth to another child on November 13, 2015.[3] DCS received a report that the newborn child "was withdrawing from substances." Tr. p. 31. FCM Prieto met with Mother, who admitted to using heroin. Mother was tested for drugs and her drug screen returned positive for both methamphetamine and heroin. This newborn child was subsequently adjudicated to be a CHINS.

---

[3] This child is not involved in the instant termination proceedings.

[9] On January 11, 2016, Mother was scheduled to appear for a sentencing hearing in her criminal case that stemmed from February of 2015. Mother appeared about two-and-a-half hours late for this hearing by which time the trial court had issued a warrant for her arrest. Mother later testified during the termination proceedings before the juvenile court that "[a]fter I got the warrant put out I went and got high." Tr. p. 115. On February 22, 2016, Mother was sentenced to a term of five years on house arrest.

[10] Mother's participation in services was inconsistent prior to being placed on house arrest in February of 2016. Once being placed on house arrest, Mother began participating in substance-abuse treatment and parenting classes in connection with the newborn child's CHINS case. Mother has since tested clean on her drug screens.[4] However, as of the date of the termination hearing, DCS had not received any progress reports relating to substance-abuse treatment or individual therapy from Mother's treatment providers.

[11] Mother acknowledged that she has not visited with the Children since January of 2016. The record provides no indication as to why Mother has, apparently, not attempted to re-establish visitation with the Children since being released from incarceration and placed on house arrest.

---

[4] Mother indicated that she understood that she would face prison time if she did not comply with the terms of her house arrest, and it is the opinion of DCS that Mother's house arrest is the reason why she has remained sober.

On February 19, 2016, DCS filed a petition seeking the termination of Mother's parental rights to the Children. The juvenile court conducted a two-day evidentiary hearing on DCS's petition on May 4 and July 13, 2016. The juvenile court took the matter under advisement and, on August 26, 2016, issued an order terminating Mother's parental rights to the Children. This appeal follows.

# Discussion and Decision

Mother contends that the evidence is insufficient to sustain the termination of her parental rights to the Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the children's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

The purpose of terminating parental rights is not to punish the parent but to protect the children. *Id.* Termination of parental rights is proper where the children's emotional and physical development is threatened. *Id.* The juvenile

court need not wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[15] Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

[16] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:
>     (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
>     (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
>     (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) termination is in the best interests of the child; and
> (D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Mother does not dispute that DCS presented sufficient evidence to support the first, second, and fourth elements set forth in Indiana Code section 31-35-2-4(b). Mother, however, does claim that DCS failed to establish that termination of Mother's parental rights is in the best interests of the children.

## Best Interests of the Children

[18] We note that in claiming that the evidence was insufficient to support the juvenile court's order terminating her parental rights, Mother does not challenge the sufficiency of the evidence to support any of the juvenile court's findings. As a result, Mother has waived any argument relating to whether these unchallenged findings are clearly erroneous. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) (providing that when an appealing party fails to challenge the findings of the trial court, the findings must be accepted as correct); *In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (providing that failure to challenges findings resulted in waiver of argument that findings were clearly erroneous), *trans. denied*. We will therefore limit our review to whether these unchallenged findings are sufficient to support the juvenile court's conclusion that termination of Mother's parental rights is in the Children's best interests.

[19] We are mindful that in considering whether termination of one's parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*,

798 N.E.2d at 203. In doing so, the juvenile court must subordinate the interests of the parent to those of the child involved. *Id*. Furthermore, this court has previously determined that the testimony of the case worker and/or a child advocate regarding the child's need for permanency supports a finding that termination is in the child's best interests. *Id*.; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

[20] Here, the juvenile court found that evidence established that the Children have a need for permanency and stability and that the termination of Mother's parental rights would serve the Children's best interests. In this regard, the juvenile court made the following specific findings:

> 5. In June of 2013[,] the DCS investigated a report of a drug overdose. The children's father overdosed and died. The DCS did not remove the children from Mother at that time.

> 6. On February 25, 2015[,] the DCS received a report that the living conditions in Mother's home were deplorable. DCS case worker Itzyana Prieto investigated and found that Mother's home was in a "deplorable" condition. There was no running water. The bathroom toilet was overflowing with feces.… There were piles of dirty dishes in the kitchen. The children appeared neglected. Two of the boys were sleeping on the floor with no mattress. Two of the boys were sleeping in a bed with no sheets. Prieto described the children as unclean and smelling of urine. [S.L.] had bruises on his nose. At the time of her investigation of the home Mother was at work. At the time five unrelated adults were staying in the home besides Mother and her boyfriend. In the basement of the home Prieto and the police officers whom accompanied her found what appeared to be a methamphetamine lab including Coleman Camp fuel, empty bottles with tubing, hypodermic needles and a spoon with white

powder. Mother denied knowing the existence of the meth lab. The DCS transported the children to the hospital to be checked. [S.L.] had a broken nose. The children were hungry. The children were removed from their Mother and placed with their maternal grandparents. Mother was arrested and charged with manufacturing methamphetamine. The children have been outside of the home of their mother since February 26, 2015.

**\*\*\*\***

9. On August 10, 2015[,] the Court held a review hearing. Mother did not appear for the hearing. The Court found that Mother was not participating in services as ordered at the disposition[al] hearing. The DCS had referred Mother to substance abuse treatment, individual therapy, [and] home based case management services. Mother had visited with the children on a regular basis but she had not attended substance abuse treatment for several weeks and she had not gone for individual therapy. The boys were defiant, angry and not listening to their caregivers. The DCS had three of the boys in individual mental health therapy.

10. On September 21, 2015[,] the Court held a hearing and entered a parental participation order. Mother did not attend this hearing. The Court ordered Mother to initiate and participate in a course of individual therapy, attend IOP/AOP and Relapse Prevention, participate in home based casework, provide drug screens, participate in supervised visitation on a regular basis, not use controlled substances, and stay in contact with the DCS and service providers. However, Mother did not consistently participate in services or visit with the children on a regular basis during this period of time. The boys were angry and frustrated with their Mother.

11. On November 13, 2015[,] Mother gave birth to another child. When DCS visited Mother[,] she admitted that she had been using heroin. The baby was in withdrawal from drugs in its

system.  In January[,] Mother began to visit with the newborn but she was not visiting consistently with the boys.  In November 2015[,] the police raided a home where Mother was staying and found an old methamphetamine lab with scales and drug paraphernalia in Mother's bedroom.

12.    On January 25, 2016[,] the Court held a permanency hearing.  The children's grandparents were having difficulty dealing with the behaviors of the children and had requested that the DCS move the children from their home.  The Court approved the DCS'[s] placement of the children in a foster home.  The Court authorized the DCS to suspend visitation between Mother and the children.  The Court found that Mother had not maintained her sobriety; she had not participated consistently in services including home based case management, individual therapy or substance abuse treatment; and that she was in jail after having been arrested.  The Court found that permanency plan should be changed to adoption.

13.    The children have significant mental health and behavioral issues.  The boys have experienced trauma as the result of losing their father to a drug overdose and other issues.  [E.L.] has a diagnosis of Oppositional Defiant Disorder.  He throws tantrums; he does not respect authority and won't listen to adult care givers.  [E.L.]'s behavior causes a lot of problems and chaos in his home.  In April 2016[,] [L.L.] was sent to HARSHA[5] for treatment of depression issues.  He had behavior problems in school and in the foster home.  He acted out, said inappropriate things and drew sexual pictures.  [L.L.] did improve somewhat after his treatment at HARSHA.  [I.L.] has a diagnosis of Oppositional Defiant Disorder.  He has a temper and intimidates other children.  [I.L.] was admitted to HARSHA for treatment.

---

[5] It appears that HARSHA is a behavior center which offers both residential and outpatient treatment for children and teenagers.  *See* https://www.rehab.com/harsha-behavioral-center/5069074-r (last visited January 5, 2017).

[E.L.], [I.L.], and [L.L.] need intensive ongoing therapy. [S.L.] is the calmest child and he seemed to adapt best to foster care.

**\*\*\*\***

15.     At the time of the termination hearing[,] [S.L.] and [I.L.] were living with their paternal grandmother. [E.L.] was moved to Crosspoint Hospital in May 2016 and he also will live with his paternal grandmother. The plan is to place all four children with their paternal grandmother who had found a larger house and planned to move into it in August 2016. Paternal grandmother has offered to adopt all four children.

16.     Mother pled guilty to three counts of possession of methamphetamine and one count of neglect of a dependent. On January 11, 2016[,] she no showed for sentencing and a warrant was issued for her arrest. She got high when she learned of the arrest warrant. Mother admitted that she did not participate in reunification services in November and December 2015 and reunification services and visitation was discontinued on January 25, 2016[,] by order of the CHINS court. Mother has been on electronic monitored house arrest since February 22, 2016. She is sentenced to five years electronic monitored home detention.

17.     Mother has since made improvements in her circumstances. She is receiving services from the DCS as the result of the CHINS proceeding involving the child she gave birth to in November 2015 (that child is not part of this termination proceeding). She is participating in individual therapy and case management services. She has restarted IOP and will finish her IOP shortly after the termination hearing. Her substance abuse counselor believes that Mother has made significant progress in her sobriety. She has not missed any substance abuse therapy sessions and her insight into her drug addiction is significantly improved. She is attending parenting classes. She lives with her grandparents who can help her with child care if the children are returned to her. She has not failed a drug screen since January

2016. She is employed at a restaurant and is saving money in order to get a house.

18. The DCS case manager believes it is in the children's best interest to terminate the parent-child relationship.

Order. Again, Mother does not challenge the sufficiency of the evidence to support these findings.

[21] While acknowledging Mother's recent progress, the juvenile court concluded as follows:

> While Mother has made improvements in her sobriety since January 2016 as she works toward reunification with her infant child she has not had any contact with these children who continue to experience significant behavior issues. These children need stability, structure and nurturing that Mother cannot currently give them and is unlikely ever to be in a position to give them. The Court must judge whether the improvements Mother has made in the last several months are only temporary improvements and whether her conduct will not improve in the long term. The Court finds that these children can wait no longer for a safe, stable and permanent home and that given all the considerations presented by this admittedly difficult case, there is a reasonable probability that Mother cannot remedy the conditions and her own deficits that caused the children to be removed from her in the first place.

Order. The juvenile court also concluded that:

> The DCS has proven by clear and convincing evidence that termination is in the best interests of the children. The children need a stable and nurturing home to meet their many needs. The DCS case manager believes that termination is in the best interest

of the children. As previously state these children need stability, structure and nurturing that Mother cannot currently give them and is unlikely to be in a position to give them in the long term.

Order.

[22] Review of the record reveals that FCM Kelly Mobley testified that she believed that the termination of Mother's parental rights was in the Child's best interests. When asked why she believed so, FCS Mobley testified that "these kids deserve a chance. They don't deserve to sit around and wait to see if mom's going to comply with house arrest. They deserve permanency, stability, not to be hanging on by a threa[d]. They are like in dire need of permanency." Tr. p. 140.

[23] In reaching its conclusion regarding the Children's best interests, the juvenile court acknowledged that while the DCS case manager testified that it is in the children's best interests to terminate Mother's parental rights, the court appointed special advocate ("CASA"), relying on the recent improvements made by Mother since being placed on house arrest, testified to the contrary. Mother relies on the testimony of the CASA in arguing that the evidence is insufficient to sustain the juvenile court's order. It is well-established, however, that the juvenile court, acting as a trier of fact, was not required to believe or assess the same weight to the CASA's testimony as Mother. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v.*

*Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. In fact, while noting Mother's progress and the CASA's testimony, the juvenile court's order indicates that it shared DCS's expressed concerns regarding whether Mother's progress would last long-term or whether it was due to the fact that Mother could be sent to prison if she violated the terms of her house arrest more so than a desire to be reunified with the Children.

[24] Again, the juvenile court did not have to wait until the Children were irreversibly harmed such that their physical, mental, and social development were permanently impaired before terminating Mother's parental rights. *See In re C.M.*, 675 N.E.2d at 1140. As such, in light of the testimony of FCM Mobley, considered with the fact that Mother has had no contact with the Children since January of 2016, the juvenile court's unchallenged factual findings, and Mother's failure to participate in or successfully complete the court-ordered services when given the opportunity, we conclude that the evidence is sufficient to satisfy DCS's burden of proving that termination of Mother's parental rights is in the Children's best interests. Mother's claim to the contrary merely amounts to an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

# Conclusion

[25] Having concluded that the evidence is sufficient to support the juvenile court's order terminating Mother's parental rights to the Children, we affirm the judgment of the juvenile court.

The judgment of the juvenile court is affirmed.

Vaidik, C.J., and Brown, J., concur.